FUNK v GENERAL MOTORS CORPORATION

OPINION OF THE COURT

1. MASTER AND SERVANT—TORTS—OWNER'S LIABILITY—DELEGATION
   OF RESPONSIBILITY—CONTRACTORS—CONTROL—NONDELEGABLE
   DUTY—PUBLIC INTEREST—IMPLICIT RISKS.

   Ordinarily a landowner is not responsible for injuries caused by a
   carefully selected contractor to whom he has delegated the task
   of erecting a structure, but an owner is responsible if he does
   not truly delegate—if he retains "control" of the work—or if,
   by rule of law or statute, the duty to guard against the risk is
   made "nondelegable"; inevitably it becomes a matter of judg-
   ment, case by case, where to draw the line between so-called
   "delegable" and "nondelegable" tasks and duties, and in a
   given case, the policy question facing a court is whether on the
   facts presented the public interest warrants imposition upon a
   person who has delegated a task the duty to guard against risks
   implicit in the performance of the task.

2. MASTER AND SERVANT—CONSTRUCTION WORKER—JOB SAFETY—EM-
   PLOYER'S RESPONSIBILITY.

   The immediate employer of a construction worker is immediately
   responsible for job safety.

3. TORTS—COMPENSATION OF VICTIMS—PREVENTION OF INJURY.

   The policy behind the law of torts is more than compensation of

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 7, 8] 62 Am Jur 2d, Premises Liability § 15.
[2, 4] 53 Am Jur 2d, Master and Servant § 195 *et seq.*
[3] 74 Am Jur 2d, Torts § 1 *et seq.*
[5, 9, 11, 13] 62 Am Jur 2d, Premises Liability §§ 12–22.
[6–8] 53 Am Jur 2d, Master and Servant § 147.
   62 Am Jur 2d, Premises Liability § 34.
[10] 74 Am Jur 2d, Torts §§ 52, 71.
[12, 13] 57 Am Jur 2d, Negligence §§ 6, 295–302.
[14, 15] 31 Am Jur 2d, Expert and Opinion Evidence §§ 26–32, 38, 151.
[16] 53 Am Jur, Trial § 116.
[17, 18] 5 Am Jur 2d, Appeal and Error § 948 *et seq.*
[19–28] 53 Am Jur 2d, Master and Servant § 139 *et seq.*

victims; it seeks also to encourage the implementation of reasonable safeguards against risks of injury.

4. MASTER AND SERVANT—CONTRACTORS—GENERAL CONTRACTOR—DANGERS—COMMON WORK AREAS—WORKMEN—PREVENTION OF INJURY—OWNER'S LIABILITY.

It is part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen; a "mere" owner would not ordinarily be rendered liable because, in contrast with a general contractor, the owner typically is not a professional builder, most owners visit the construction site only casually and are not knowledgeable concerning safety measures, and supervising job safety, providing safeguards, is not part of the business of the typical owner.

5. MASTER AND SERVANT—CONSTRUCTION CONTRACT—SAFETY PRECAUTIONS—PREVENTION OF INJURY—OWNER'S LIABILITY—CONTROL.

The jury could properly hold a corporation, designated as the owner in a construction contract, liable for the failure to observe safety precautions and provide safeguards where the actual working relationship evidenced that the corporation exercised a retained control of the construction project; it exercised an unusually high degree of control over the construction project from its very inception, its internal divisions drew up the building plans, wrote the contractual specifications, and acted as architectural supervisor, it directly hired several of the contractors including the employer of a worker who was injured on the job, wrote the contracts agreed to by those contractors and only later assigned the contracts to the general contractor, its representative could order the general contractor to terminate any prime or subcontractor within 24 hours, it retained the right to continue hiring additional subcontractors and then, if desired, assign their contracts to the general contractor for coordination with the other contractors, and its representative was daily at the job site interpreting the contract specifications and plans for the general contractor and, aided by other corporation on-the-spot inspectors, he ensured that the "general conditions" and other provisions of the contract were being fulfilled; these included safety requirements, quality and performance of the work, fire protections, price restraints, and completion deadlines.

6. MASTER AND SERVANT—CONSTRUCTION WORKERS—PREVENTION OF
   INJURY—SUPERINTENDING CAPACITY—OWNER'S LIABILITY—
   SAFETY PRECAUTIONS.

   The law does not absolve an owner who acts in a superintending
   capacity and has knowledge of high degrees of risk faced by
   construction workers from responsibility for failing to require
   observance of reasonable safety precautions.

7. MASTER AND SERVANT—OWNER'S LIABILITY—CONTROL—ACCIDENT
   PREVENTION—COMMON WORK AREAS—SAFETY PRECAUTIONS.

   An owner's representative's supervision over some aspects of
   accident prevention at a plant construction site coupled with
   his extensive supervision of other specifications, and the own-
   er's overall, day-to-day, dominance of the project, supports a
   finding of, if not actual, at least tacit control by the owner of
   safety in the highly visible common work areas and, having
   assumed a dominant role in the construction job, the owner can
   properly be held responsible for the failure to implement
   adequate safety precautions.

8. MASTER AND SERVANT—OWNER'S LIABILITY—CONSTRUCTION CON-
   TRACT—CONTROL—NEGLIGENCE—SAFETY PRECAUTIONS.

   Liability for failure to implement adequate safety precautions is
   *not* "to be imposed upon every property owner who enters into
   a construction contract" but a corporation is subject to liability
   in an action for injuries to a workman on a plant construction
   job because a jury could properly conclude that the corporation,
   despite its designation as owner in a construction contract,
   retained and exercised sufficient control so that it ought to be
   held responsible for its own negligence in failing to implement
   reasonable safety precautions by the general contractor and
   subcontractor.

9. MASTER AND SERVANT—TORTS—SLIP-AND-FALL CASE—CONSTRUC-
   TION CONTRACT—ENTERPRISE RESPONSIBILITY—PREVENTION OF
   INJURY—SAFETY PRECAUTIONS—CONTRACTORS—CONTROL—FIND-
   INGS OF JURY—NEW TRIAL.

   The Michigan Supreme Court is not persuaded that the imposi-
   tion of enterprise responsibility on a corporation, which was
   designated as the owner in a construction contract, *qua* owner,
   is justified where it was not an unusual construction job, the
   risk—slip and fall—was not unique, reasonable safeguards
   against injury could readily have been provided by taking well-
   recognized safety measures, and the owner appears to have
   selected a responsible, experienced contractor, and therefore a
   new trial should be ordered as to the owner-corporation, which

had been found liable as a third-party tortfeasor for a workman's injuries, because, although the jury could have properly returned a verdict against the corporation on the basis of its exercise of retained control, the jury may have found against the corporation *as owner* on the alternative theory of liability which should not have been submitted.

10. TORTS—WORKMEN'S COMPENSATION.

The question whether there is, under the law of torts, an alternative source of recovery to workmen's compensation is to be decided without regard to whether other workmen "similarly situated" have such a source or whether a decision adverse to liability may deny any alternative source or recovery to a particular workman.

11. TORTS—CONTRACTORS—GENERAL CONTRACTOR—CONTRACTOR'S LIABILITY—PREVENTION OF INJURY—SAFETY PRECAUTIONS—COMMON WORK AREAS.

It is an appropriate development of the law of torts to impose responsibility on a general contractor for failure to implement safety measures in common work areas guarding against readily observable, avoidable serious risks of personal injury.

12. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTION OF FACT—QUESTION OF LAW.

The question of contributory negligence is generally one of fact, not of law.

13. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—SLIP-AND-FALL CASE—EVIDENCE—FINDINGS OF JURY—JOB ENVIRONMENT—PROPERTY OWNER—GENERAL CONTRACTOR—CONSTRUCTION CONTRACT—PREVENTION OF INJURY—SAFETY PRECAUTIONS—SAFETY INDOCTRINATION.

There was adequate evidence from which a jury could conclude that a workman who sustained injuries from a fall did not act unreasonably in the circumstances by going upon and opening a hole in the roof of a plant under construction; the jury could properly conclude that a cause of the workman's injury was the job environment created by the general contractor and the corporation, designated as the owner in the construction contract, which had conditioned him to work without regard to the conspicuous absence of safety equipment where his foreman had instructed, "[i]f you don't want to work up in the steel, go home", and the worker, a house plumber, had not previously worked on a construction project of that magnitude and he was given no safety indoctrination.

14. TRIAL—EVIDENCE—WITNESSES—EXPERT WITNESS—CONSTRUCTION PRACTICES—DISCRETION.

Allowing a witness to testify as an expert regarding construction practices in Michigan despite his relative unfamiliarity with Michigan construction projects was not an abuse of discretion, where he had considerable national experience with large-scale construction and his other credentials were extensive.

15. MASTER AND SERVANT—SLIP-AND-FALL CASE—WITNESSES—EXPERT WITNESS—STEEL BEAMS—COMMON WORK AREAS—PREVENTION OF INJURY—SAFETY EQUIPMENT—SAFETY ENGINEERING—CONSTRUCTION INJURIES—STANDARD OF CONDUCT—CAUSE OF INJURY.

An expert witness's testimony regarding the dangers inherent in working on steel beams without safety equipment who described the developing science of safety engineering and how other contracting entities, by relying on science's advancements, had achieved significant reductions in construction injuries assisted the jury in establishing a standard of conduct against which they could contrast the efforts of the defendants, the general contractor and the owner of the plant where the plaintiff workman was injured in falling while working on the roof of the plant which was under construction, this testimony tended to show the failure of the general contractor to take reasonable precautions to alleviate readily observable, avoidable, dangerous situations in common work areas and, merely because the worker's accident occurred on the roof, and not the beams, does not make the expert's testimony any less admissible; on the same analysis, even though the worker fell from the roof, and not the beams, the jury could properly conclude that the failure to provide any safety equipment anytime anywhere for men working over 30 feet above the ground was the cause in fact of the worker's *injury.*

### DISSENTING OPINION

### M. S. COLEMAN, J.

16. TRIAL—DISCRETION—ORDER OF PROOF—SEQUENCE OF WITNESSES.

*The conduct of a trial is controlled by the judge's discretion and this includes the order of proof and the sequence of witnesses.*

17. APPEAL AND ERROR—TRIAL—PREJUDICIAL ERROR—REVERSAL.

*Any error made in the conduct of a trial must be prejudicial in order to warrant reversal.*

18. Trial—Reversal—Bias—Construction Industry—Evidence—Expert Witnesses.

*General verdict against the owner of property and a general contractor warrants reversal where a bias against the construction industry in general and defendants in particular permeated the proceedings, rendering it impossible to receive an impartial and fair hearing and, if the facts of the case had been presented first, it is unlikely that much, if any, of the testimony of an expert witness would have been admitted.*

19. Master and Servant—Inherently Dangerous Activity—Corporations—Homeowners.

*The doctrine of inherently dangerous activity applies not only to corporations, but is equally applicable to homeowners or any other citizens who employ others to do work for them.*

20. Master and Servant—Torts—Independent Contractor—Employer's Liability—Inherently Dangerous Activity—Third Parties.

*Generally an employer is not liable for the torts of an independent contractor but an exception has been developed for activities or tasks which reasonably can be foreseen as dangerous to third parties, with a few cases extending the exception to employees; these activities include those dangerous despite all reasonable care and those dangerous unless reasonable care is exercised; this doctrine imposes a form of strict liability upon the owner or employer of the independent contractor; however, such liability is not absolute.*

21. Master and Servant—Inherently Dangerous Activity—Independent Contractor—Unavoidable Injury—Foreseeable Dangers.

*A defendant should not be held liable under the inherently dangerous activity doctrine if defendant perceives the possibility of danger, takes all reasonable steps to prevent injury from occurring and injury unavoidably occurs; similarly, the owner or employer of an independent contractor should not be required to foresee all possible activities which might create a dangerous situation and lead to injury.*

22. Master and Servant—Dangerous Activity—Torts—Independent Contractor—Employer's Liability—Third Parties—Damages.

*The inherently or intrinsically dangerous activity exception, to the general rule that an employer is not liable for the torts of*

an independent contractor, was designed to prevent the employer from delegating his or her responsibility to eliminate or minimize foreseeable risks; the thrust of the exception was to impose a duty on the employer in certain circumstances; it was not designed to afford a single class of injured persons an additional theory upon which to seek damages and the availability of the doctrine should not be limited to nonemployee third parties.

23. MASTER AND SERVANT—INHERENTLY DANGEROUS ACTIVITY—THIRD PARTIES.

The Michigan Supreme Court has not seen fit to limit the availability of the doctrine of inherently or intrinsically dangerous activity to nonemployee third parties.

24. MASTER AND SERVANT—INHERENTLY DANGEROUS ACTIVITY—QUESTION OF LAW—BREACH OF DUTY—QUESTION OF FACT—PROXIMATE CAUSE.

The threshold question of what duty there is under the circumstances of the case is one of law for the judge when deciding whether liability is to be imposed under the doctrine of inherently dangerous activity; the factual question of whether there was a breach of such duty, if any, is for the fact finder unless there are no facts upon which reasonable minds could disagree and it is also for the fact finder to determine whether the breach of duty, if any, was the cause or proximate cause of the injury.

25. MASTER AND SERVANT—INHERENTLY DANGEROUS ACTIVITY—INDEPENDENT CONTRACTOR—FALL—FORESEEABLE DANGERS.

The threshold question of what duty there is under the circumstances of the case when deciding whether liability is to be imposed under the doctrine of inherently dangerous activity must be resolved in favor of defendants, the owner of property and a general contractor, because it is unreasonable to impose upon the defendants a duty to foresee that not only would plaintiff, the employee of an independent contractor, act contrary to the custom of his trade in at least two respects, but proceed to lift 200-pound slabs, turn them back on the roof and replace all but the last two removed, and fall through a hole left by removing one of the slabs; any required precautions against foreseeable dangers would not reasonably have included the hazard made by plaintiff himself.

26. TRIAL—INSTRUCTIONS—DANGEROUS WORK.

Instruction quoting common dictionary definition of "inherently"

*and "intrinsically" dangerous work was not sufficient as legal definition of so complex a doctrine.*

27. MASTER AND SERVANT—INHERENTLY DANGEROUS ACTIVITY—INDE-
PENDENT CONTRACTOR—FORESEEABLE DANGERS—BREACH OF
DUTY—PROXIMATE CAUSE.

*Some of the elements of the doctrine of inherently or intrinsically dangerous activity are: (1) it is work done by an independent contractor involving a high degree of risk in relation to the specific surroundings or involving some specific peculiar risk or set of risks to those in the vicinity which requires special, unusual care, (2) it is work which probably would result in injury, (3) there is a risk or danger recognizable in advance (foreseeable) as requiring special precautions, (4) such special precautions are not taken, and (5) this breach of duty is the cause or proximate cause of injury.*

28. TRIAL—FAIR TRIAL—EXPERT TESTIMONY—NEW TRIAL—EVIDENCE
—INHERENTLY DANGEROUS ACTIVITY—FORESEEABLE DANGERS—
BREACH OF DUTY—INSTRUCTIONS.

*Case should be remanded for a new trial where defendants were denied a fair trial by plaintiff's failure to establish the basic facts prior to introducing certain expert and nonexpert testimony, by the failure to link such testimony with the pertinent facts and by plaintiff's introduction of unnecessary "expert" testimony which had no probative value and much prejudicial effect; defendants may not be held liable under a theory of inherently dangerous activity where they could not foresee nor could they have been reasonably expected to foresee the manner in which the accident occurred; defendants have breached no duty and, at least, the instruction as to inherently dangerous activity was inadequate.*

Appeal from Court of Appeals, Division 2, Quinn, P. J., and J. H. Gillis and Van Valkenburg, JJ., reversing Genesee, Elza H. Papp, J. Submitted March 7, 1973. (No. 10 March Term 1973, Docket No. 53,928.) Decided August 2, 1974. Rehearing denied November 22, 1974.

37 Mich App 482 reversed.

Complaint by Ellis Funk against General Motors Corporation and Darin & Armstrong for damages

for injuries sustained from a fall. Judgment for plaintiff. Defendants' motions for judgment notwithstanding the verdict denied. Defendants appealed to the Court of Appeals. Order entered granting defendants' motions for judgment notwithstanding the verdict. Plaintiff appeals. Judgment of the trial court affirmed as to Darin & Armstrong; reversed as to General Motors Corporation and remanded for a new trial.

*Harry M. Philo,* for plaintiff.

*Plunkett, Cooney, Rutt & Peacock* (by *Jeannette A. Paskin [Ross L. Malone* and *Thomas W. Watkins,* of counsel]), for defendant General Motors Corporation.

*Gault, Davison & Bowers,* for defendant Darin & Armstrong.

LEVIN, J. Ellis Funk, a journeyman plumber, was seriously injured on a plant construction job. He recovered workmen's compensation benefits from his employer, Ben Agree Company, a plumbing subcontractor.

In this action, a jury returned a verdict for Funk against the general contractor, Darin & Armstrong, and the owner of the plant, General Motors Corporation, whom Funk contends are liable as third-party tortfeasors for his injuries.

The Court of Appeals granted the defendants a judgment notwithstanding the verdict holding that Funk had himself created the dangerous condition which was the immediate cause of his injury. *Funk v General Motors Corp,* 37 Mich App 482; 194 NW2d 916 (1972).

Funk had hung six-inch piping from steel beams of the superstructure of a clear-span addition to a

General Motors plant. He was then ordered to move approximately 600 feet of the piping.

To move the piping, Funk climbed onto the beams just as he had when they were initially hung. From this position he hammered the hooks holding the piping. Because of roof slabs, which by then had been added, he was unable to reach some of the hooks and went onto the roof. He removed some slabs and was injured when he lost his balance and fell more than 30 feet to the ground.

The immediate cause of the accident was the manner in which Funk chose to complete the assigned task. By removing the roof slabs, he opened a hole in the roof and then slipped and fell through the opening. This case, says General Motors, "is a classic example of the man who, in a sense, dug a hole and regrettably fell into it".

Funk charges negligence in the defendants' failure to implement reasonable safety precautions for men working over 30 feet above the ground. He contends that General Motors and Darin & Armstrong exposed him to avoidable injury by allowing subcontractors to order the men to work at dangerous heights without any protection from falls in a job environment in which laborers were expected to complete their assigned tasks without regard to the absence of safety equipment guarding against injury in the event of a mishap.

The defendants counter that owners and general contractors are not subject to liability for the negligence of an independent contractor (Funk's employer, Ben Agree), and since Funk fell from the roof—rather than from the beams—the absence of safety equipment at the beams was not the cause in fact of his injury.

We conclude that while ordinarily the owner of a building under construction is not responsible to

construction workers for job safety, in this case General Motors could properly be found to have sufficiently exercised a retained control subjecting it to liability for the failure to implement reasonable safety precautions.     .

The scope of a general contractor's responsibility will often depend on the nature of the risk and of the precaution or safeguard claimed to have been omitted. In this case it was proper to find Darin & Armstrong responsible for the safety omissions which gave rise to Funk's injury.

We reverse the Court of Appeals and affirm the verdict against Darin & Armstrong, but, because of instructional error, remand for a new trial as to General Motors.

I

Ordinarily a landowner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated the task of erecting a structure. Most every rule has its exceptions. This rule is distinguished by the variety of its exceptions.[1]

An owner is responsible if he does not truly delegate—if he retains "control" of the work—or if, by rule of law or statute, the duty to guard against the risk is made "nondelegable".

Inevitably it becomes a matter of judgment, case by case, where to draw the line between so-called "delegable" and "nondelegable" tasks and duties. In a given case, the policy question facing a court (the law of torts is largely judge-made) is whether on the facts presented the public interest warrants

---

[1] "Indeed it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions." *Pacific Fire Insurance Co v Kenny Boiler & Manufacturing Co,* 201 Minn 500, 503; 277 NW 226, 228 (1937).

imposition upon a person who has delegated a task the duty to guard against risks implicit in the performance of the task.[2]

The immediate employer of a construction worker (Ben Agree, in this instance) is immediately responsible for job safety.[3]

The question now presented is whether, in the circumstances of this case, the immediate employer having conspicuously failed to provide any safety equipment, this general contractor and this owner, fully knowledgeable of the employer's dereliction, had the responsibility either to require the employer to implement a meaningful safety program or to themselves supply the obviously necessary safety equipment.

## II

Mishaps and falls are likely occurrences in the course of a construction project. To completely avoid their occurrence is an almost impossible task. However, relatively safe working conditions

---

[2] "The real question in all independent contractor cases is whether a man may 'farm out' or 'lop off' some of his affairs and escape liabilities in connection with them. No general policy forbids this. 'There seems to be no compelling reason * * * why a lawyer should have to repair his own shoes, or fill his own teeth,' or incur liability to outsiders for harm caused by the cobbler or the dentist in doing these things for him." 2 Harper & James, The Law of Torts, § 26.11, p 1400.

[3] The Construction Safety Act of 1963, MCLA 408.711, *et seq.;* MSA 17.469(1), *et seq.,* authorizes the State Construction Safety Commission to "promulgate safety rules and regulations for the inspection and use of equipment and for safe working conditions, based upon generally accepted nationwide engineering standards and practices" for the "construction industry", defined as "construction firms, employers and contractors" with qualifications set forth in the act. The word "employers" was added by amendment. 1970 PA 156. Rules have been promulgated. *See, e.g.,* Administrative Code 1964–1965 AACS, R 408.1101, *et seq.,* pp 3289–3331.

Neither the judge's instructions nor the issues briefed and argued by counsel justify an expression by this Court concerning the scope of coverage under the act.

may still be provided by implementing reasonable safety measures to prevent mishaps from causing aggravated injuries such as those suffered by Funk. Funk's injuries probably would have been kept to a minimum or avoided altogether if there had been provided either suspending nets, scaffolding, bucket cranes, safety belts or harnesses.

The plumbing subcontractor's failure to provide safety equipment for the men working along the steel did not represent just an occasional lapse. The steel frame was a common work area of many trades. Iron workers who "walked [the] beams", and pipe fitters and electricians, although "they were able to gain handholds", were exposed to similar risks. Throughout the especially precarious winter months, when snow and ice made conditions even more hazardous, and subsequently, closer in time to Funk's injury, it was obvious to even the most casual observer that the men in the steel were without safety harnesses or belts and there was no safety net under the men.[4]

Arthur Collins, pursuant to his duties as architect-engineer superintendent for General Motors' Argonault Realty Division, was constantly on the construction site and observed numerous tradesmen working on the beams with "no nets or safety lines".[5] Similarly, John McCarty, Darin & Armstrong's project superintendent, during his repeated "tours throughout the day" of the job site,

---

[4] The continual nature of the danger created by the absence of any safety equipment distinguishes this case from several cited by General Motors and Darin & Armstrong in which the defect which caused plaintiff's injury was not previously apparent. *See Wilson v Portland General Electric,* 252 Or 385; 448 P2d 562 (1968); *Epperly v Seattle,* 65 Wash 2d 777; 399 P2d 591 (1965); *Hurst v Gulf Oil Corp,* 251 F2d 836 (CA 5, 1958).

[5] Collins, in response to a question whether he was concerned about the men suffering serious injury because of the absence of safety equipment, answered: "I never gave that a thought. I would assume that if a man fell he wouldn't be working in the steel."

frequently observed men working in the beams, but never saw any "safety belts or safety nets".

The policy behind the law of torts is more than compensation of victims. It seeks also to encourage implementation of reasonable safeguards against risks of injury.

Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.

"[A]s a practical matter in many cases only the general contractor is in a position to coordinate work or provide expensive safety features that protect employees of many or all of the subcontractors. * * * [I]t must be recognized that even if subcontractors and supervisory employees are aware of safety violations they often are unable to rectify the situation themselves and are in too poor an economic position to compel their superiors to do so." *Alber v Owens*, 66 Cal 2d 790; 59 Cal Rptr 117, 121–122; 427 P2d 781 (1967).

We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen.

This analysis would not ordinarily render a "mere" owner liable.[6] In contrast with a general

---

[6] Nor would this analysis be applicable where the employee of a subcontractor seeks to recover from another subcontractor. *See Klovski v Martin Fireproofing Corp*, 363 Mich 1; 108 NW2d 887 (1961).

contractor, the owner typically is not a professional builder. Most owners visit the construction site only casually and are not knowledgeable concerning safety measures. See, *e.g., Gonzales v Robert J. Hiller Construction Co,* 179 Cal App 2d 522; 3 Cal Rptr 832, 835 (1960), where the owner was held not liable for the negligence of his contractor. He had been around the construction site daily to watch its progress and was as familiar with construction work as "any layman is who has seen a number of them built, and who has invested in them." Supervising job safety, providing safeguards, is not part of the business of the typical owner.

### III

Although the contract designated General Motors as owner and Darin & Armstrong as general contractor, the actual working relationship evidenced exercise by General Motors of a retained control of the project. See *Bissell v Ford,* 176 Mich 64; 141 NW 860 (1913). The jury could properly hold General Motors liable for the failure to observe safety precautions and provide safeguards.

General Motors exercised an unusually high degree of control over the construction project from its very inception. Its internal divisions drew up the building plans, wrote the contractual specifications, and acted as architectural supervisor. It directly hired several of the contractors, including Ben Agree, wrote the contracts agreed to by those contractors, and only later assigned the contracts to Darin & Armstrong.

Arthur Collins, General Motors' representative, testified that he could order Darin & Armstrong to terminate any prime or subcontractor within 24 hours. General Motors also retained the right to

continue hiring additional subcontractors and then, if desired, assign their contracts to Darin & Armstrong for coordination with the other contractors.[7]

Collins—daily at the job site—interpreted the contract specifications and plans for Darin & Armstrong. Aided by other General Motors on-the-spot inspectors, he ensured that the "general conditions" and other provisions of the contract were being fulfilled. These included safety requirements, quality and performance of the work, fire protection, price restraints and completion deadlines.

General Motors relies on cases which state that an owner who engages a general contractor for a construction project does not, by retaining a right of inspection, assume a duty to inspect the work practices and equipment of the various subcontractors.[8] The law does not, however, absolve an owner who acts in a superintending capacity and has knowledge[9] of high degrees of risk faced by con-

[7] See Lee v Junkans, 18 Wis 2d 56, 60–61; 117 NW2d 614, 617 (1962), where the Supreme Court of Wisconsin sustained a jury's finding that an owner who had employed a contractor to construct a dwelling had nonetheless retained control and was subject to liability to an injured workman. The owner "personally worked on the job and also purchased some of the materials necessary for the job," and himself "engaged such other tradesmen as the excavators, plumbers, and electricians".

[8] See Gowdy v United States, 412 F2d 525, 529 (CA 6, 1969), cert den 396 US 960; 90 S Ct 437; 24 L Ed 2d 425 (1969); Lipka v United States, 249 F Supp 213 (ND NY, 1965), aff'd 369 F2d 288 (CA 2, 1966) (discussed in fn 11, infra).

[9] Neither General Motors nor Darin & Armstrong may properly complain that they did not have "actual or constructive notice of the defect". See Sposito v Zeitz, 23 Wis 2d 159; 127 NW2d 43, 45 (1964). In Summers v Crown Construction Co, 453 F2d 998, 999 (CA 4, 1972), the Court affirmed a jury verdict against a general contractor in favor of an employee of a subcontractor. The general contractor's superintendent was aware of a defect in the subcontractor's crane which caused the employee's injury, but did nothing to have it repaired or replaced: "We affirm because the accident resulted in part from the failure of the general contractor to exercise the broad control it had retained over safety practices on the job". Contrast Munson v Vane-Stecker Co,

struction workers from responsibility for failing to require observance of reasonable safety precautions.

Collins' general concern for adherence to contractual requirements was relaxed when it came to observation of safety requirements. He maintained that it was not General Motors' "prerogative to direct safety on the job"; it "was the general contractor's duty". However, he did report "anything obviously wrong that was dangerous" to John McCarty, Darin & Armstrong's supervisor, and expected him to correct it. The activities of Collins and his assistants prompted McCarty to defer to some extent to Collins in the area of safety, just as he deferred to Collins in other areas.

Collins' supervision over some aspects of accident prevention, coupled with his extensive supervision of other specifications, and General Motors' overall, day-to-day, dominance of the project, supports a finding of, if not actual, at least tacit control by General Motors of safety in the highly visible common work areas.[10]

---

347 Mich 377; 79 NW2d 855 (1956), *Garczynski v Darin & Armstrong*, 420 F2d 941 (CA 6, 1970), *and Peter v Public Constructors, Inc*, 368 F2d 111 (CA 3, 1966), where the evidence did not tend to show any knowledge on the part of the general contractor of a defect or of failure to observe safety precautions.

[10] We agree, paraphrasing *Eutsler v United States,* 376 F2d 634, 636 (CA 10, 1967), that neither an owner nor a contractor is necessarily in violation of a legal duty because it has undertaken to impose certain safety precautions in some areas and has failed to impose similar precautions in all areas.

General Motors' selective enforcement of obvious safety derelictions does not by itself impose on it the duty to enforce all safety requirements. It does, however, represent an indicia of retained and exercised control. The pervasiveness of the control by General Motors represented more than just an "isolated occurrence". *Lipka v United States, supra,* p 216, where the trial judge sat as trier of fact and his findings of nonexercise of control and of no liability on the part of the government were sustained on appeal. *See, also, Sword v Gulf Oil Corp,* 251 F2d 829 (CA 5, 1958), where the evidence did not establish that the owner's representative gave any directions concerning safety practices.

Job safety, like most everything else, costs money. General Motors' acquiescence in Darin & Armstrong's failure itself to provide or to require the subcontractors to provide safety devices represented a saving in expenditures.

Collins and his assistants did more than observe whether the contract was being properly performed. In many instances, what they said, or left unsaid, determined how the work would be performed. In the area of job safety their knowing acquiescence in nonperformance encouraged, if not legitimized, the derelictions of the sub- and general contractors.[11] Having assumed a dominant role in this construction job, General Motors can properly be held responsible for the failure to implement adequate safety precautions.

In response to the questions posed by General Motors, we answer "no"; liability is *not* "to be imposed upon every property owner who enters into a construction contract". Nor is liability imposed on General Motors "merely because [it] is a large corporation, rather than an individual, or perhaps a partnership".

General Motors is subject to liability because a jury could properly conclude that General Motors, despite its designation as owner, retained and exercised sufficient control so that it ought to be held responsible for its own negligence in failing to implement reasonable safety precautions by the general contractor and subcontractor. See *Qui-*

---

[11] *Compare Broderick v Cauldwell-Wingate Co,* 301 NY 182, 186; 93 NE2d 629 (1950), where the general superintendent of the general contractor, when asked about safety precautions, told a subcontractor's employee, "There are no shores going in there. *Go ahead. It is all right."* and *Trecartin v Mahony-Troast Construction Co,* 18 NJ Super 380; 87 A2d 349 (1952), where the general contractor's project manager specifically instructed a subcontractor to disregard safety requirements.

*nones v Upper Moreland Twp,* 293 F2d 237 (CA 3, 1961).[12]

## IV

The trial judge generally explained to the jury the responsibility of a general contractor to guard against obvious, avoidable risks. She instructed that Darin & Armstrong owed a duty "to provide proper supervision and inspection as was necessary" and "to stop work or order changes if it saw through its agents or employees an obvious dereliction of duty by Ben Agree Company". She defined "obvious" as "open to view", "dereliction" as "culpable neglect", and "culpable" as "deserving of blame or censure".

The judge instructed the jury that General Motors would be liable if the work assigned Funk was "inherently, or intrinsically dangerous". She defined "inherently" as "belonging to the very nature of the thing", "intrinsically" as "arising from the true or fundamental nature of a thing".

The risks inherent in large-scale construction work justify imposing responsibility on a responsible person to take appropriate precautions. However, as the authorities cited by the parties illustrate, it is difficult to generalize as to which party or entity should bear this responsibility.

In some instances, as to some risks, it will appear unwarranted to impose the responsibility on anyone other than the immediate employer of

---

[12] In the cited case the owner was held liable. Its engineer's inspector visited the job two or three times a week, knew that the trench which gave way was not shored as required by Pennsylvania law and never gave instructions that shoring was to be installed. The Court found the evidence sufficient to support findings of retention of control by the owner concerning the performance of the contract and that the owner was negligent in not having required the contractor to shore the trench in conformity with the requirements of law.

the workman, whether he be a subcontractor or general contractor. In other circumstances, as here, it will appear, by reason of additional factors, that responsibility should be imposed on the general contractor. In still others, nothing short of imposition of complete enterprise responsibility on the owner will be consistent with the developing policies of the law of torts.[13]

This was not an unusual construction job. The risk—slip and fall—was not unique. Reasonable safeguards against injury could readily have been provided by taking well-recognized safety measures. The owner appears to have selected a responsible, experienced contractor.[14] We are not persuaded that the imposition of enterprise responsibility on this owner, qua owner, is justified and, therefore, order a new trial as to General Motors because, although the jury could have properly returned a verdict against General Motors on the basis of its exercise of retained control,

---

[13] Compare Widman v Rossmoor Sanitation, Inc, 19 Cal App 3d 734; 97 Cal Rptr 52 (1971), and Stilson v Moulton-Niguel Water District, 21 Cal App 3d 928; 98 Cal Rptr 914 (1971), with Celender v Allegheny County Sanitary Authority, 208 Pa Super 390; 222 A2d 461 (1966); Chaney v New York City Transit Authority, 12 App Div 2d 61; 208 NYS2d 205 (1960); Garczynski v Darin & Armstrong, supra; Lenderink v Village of Rockford, 135 Mich 531; 98 NW 4 (1904).

[14] We recognize that some general contractors may not be financially responsible and that their financial difficulties may render them less likely to observe safety precautions. This relates to the question whether the owner was negligent in selecting the contractor, not the broader question of whether owners generally are relieved of tort responsibility for tasks delegated to a carefully selected contractor.

We also recognize that a contractor, in seeking the award of a project, may be impelled by competition to submit a bid which inadequately provides for necessary safety equipment. Cf. Lake Superior Iron Co v Erickson, 39 Mich 492, 502 (1878). The facts of this case do not require an expression from this Court whether an owner should be subject to liability for the "negligence of his contractor" where the deficiency in cost allocation for safety equipment is or ought to be apparent and the owner, nevertheless, knowingly accepts the bid.

the jury may have found against General Motors *as owner* on the alternative theory of liability which should not have been submitted.

## V

General Motors asserts that "the whole purpose" of Funk's and similarly injured workmen's "lawsuits is to circumvent the workmen's compensation laws."

Funk stresses, in contrast, that because of the statutory exculpation from tort liability of the immediate employer under the workmen's compensation law, unless the owner is responsible, without regard to whether he exercises a retained control of the work, a workman may not have a source of recovery under the law of torts. Imposing tort liability on owners might prompt them to require greater care on the part of a general contractor or immediate employer of a workman.

In 1952, the Workmen's Compensation Act was amended to provide that the acceptance of compensation benefits shall not act as an election of remedies[15] and "the liability of [a] third party" tortfeasor might be enforced. It is further provided that "[i]n an action to enforce the liability of a third party, the plaintiff may recover any amount which the employee or his dependents or personal representative would be entitled to recover in an action in tort".[16]

This legislative reference to the law of torts, providing in effect that *if* a workman has an

---

[15] Until 1952, where the injury "was caused under circumstances creating liability in some person other than the employer to pay damages", an employee had an option of proceeding at law against the third party or against the employer for compensation under the act "but not against both." 1948 CL 413.15.

[16] 1952 PA 155, amending 1948 CL 413.15, presently MCLA 418.827; MSA 17.237(827).

alternative source of recovery under the law of torts he may maintain an action, is bound to produce erratic results. Some workmen will have an alternative source of recovery, while others will not.[17]

An unstated premise of the legislative reference to the law of torts is that the development of that body of law will neither be stimulated nor impeded because the result would create or deny a workman a source of recovery alternative to workmen's compensation.

The question whether there is, under the law of torts, an alternative source of recovery to workmen's compensation is to be decided without regard to whether other workmen "similarly situated" have such a source or whether a decision adverse to liability may deny any alternative source of recovery to a particular workman.

We are satisfied, however, for reasons already stated, that on the facts of this case it is an appropriate development of the law of torts to impose responsibility on a general contractor for failure to implement safety measures in common work areas guarding against readily observable, avoidable serious risks of personal injury. The basis of General Motors' liability, exercise of retained control, has long been established.

## VI

The defendants contend that Funk's "negligence" in leaving the steel beams and going to the roof to complete his task absolves them as a matter of law of any responsibility for his injury.

A jury could properly conclude that a cause of

---

[17] If General Motors had, for example, itself built the addition to the plant and had directly employed Funk, workmen's compensation would clearly have been Funk's exclusive remedy.

Funk's injury was the job environment created by the defendants which had conditioned him to work without regard to the conspicuous absence of safety equipment. The Ben Agree foreman had instructed, "If you don't want to work up in the steel, go home". Funk, a house plumber, had not previously worked on a construction project of this magnitude. He was given no safety indoctrination.

The question of contributory negligence is generally one of fact, not of law. There was adequate evidence from which the jury could conclude that Funk did not act unreasonably in the circumstances by going upon and opening a hole in the roof.

Normally, our review of the contributory negligence defense would now cease. However, since a new trial of the claim against General Motors has been ordered, we have considered whether the defense of contributory negligence bars recovery where the trier of fact may reasonably find that the failure to provide necessary safety equipment was the cause in fact of the injury.

Courts have found the defense of ordinary[18] contributory negligence inapposite to a claim predicated on a breach of a legislatively-imposed safety regulation:

"Workmen such as the present plaintiff, who ply their livelihoods on ladders and scaffolds, are scarcely in a position to protect themselves from accident. They usually have no choice but to work with the equipment at hand, though danger looms large. The legislature recognized this and, to guard against the known hazards of the occupation, required the employer to safeguard the workers from injury caused by faulty or inadequate equipment. If the employer could avoid this

---

[18] If a plaintiff's malfeasance constitutes "gross negligence" amounting to recklessness different principles apply. *See Bowman v Redding & Co,* 145 US App DC 294; 449 F2d 956 (1971). ·

duty by pointing to the concurrent negligence of the injured worker in using the equipment, the beneficial purpose of the statute might well be frustrated and nullified." *Koenig v Patrick Construction Corp,* 298 NY 313, 318–319; 83 NE2d 133, 135 (1948).[19]

We discern no reason why the same principle should not govern if the trier of fact finds that the employer-defendant's breach of a common-law duty to provide safety equipment is the cause in fact of plaintiff's injury. In *Soronen v Olde Milford Inn, Inc,* 46 NJ 582, 592; 218 A2d 630, 636 (1966), the New Jersey Supreme Court ruled that the defense of contributory negligence may not be asserted in a common-law action against a tavern keeper who, in violation of a regulation of the Division of Alcoholic Beverage Control, negligently sells alcoholic beverages to a visibly intoxicated person and proximately causes or contributes to his resulting injury:

"The accountability [of the tavern owner] may not be diluted by the fault of the patron *for that would tend to nullify the very aid being afforded.* Since the patron has become a danger to himself and is in no position to exercise self-protective care, it is right and proper that the law view the responsibility as that of the tavern keeper alone." (Emphasis supplied.)

## VII

The defendants also contend that the testimony of Robert Jenkins, Funk's expert witness, should not have been admitted because he was not qualified to testify regarding construction practices in Michigan.

Despite his relative unfamiliarity with Michigan

---

[19] *See, also, Osborne v Salvation Army,* 107 F2d 929 (CA 2, 1939), and *Bowman v Redding & Co, supra.*

construction projects, Jenkins had considerable national experience with large-scale construction. His other credentials were extensive. It was not an abuse of discretion to allow him to testify.[20]

The defendants also contend that because Funk was injured while working on the roof after leaving the steel, Jenkins' testimony regarding the dangers inherent in working on steel beams without safety equipment was irrelevant and immaterial.

This argument erroneously focuses on the cause of Funk's *mishap*. Jenkins described the developing science of safety engineering and how other general contracting entities, by relying on the science's advancements, had achieved significant reductions in construction injuries. His testimony assisted the jury in establishing a standard of conduct against which they could contrast the efforts of the defendants. The typical juror is little informed, if even aware, of the scientific basis of safety engineering and the progress of the science.

Jenkins' testimony tended to show the failure of the general contractor to take reasonable precautions to alleviate readily observable, avoidable, dangerous situations in common work areas. Merely because Funk's accident occurred on the roof, and not the beams, does not make Jenkins' testimony any less admissible.

On the same analysis, even though Funk fell from the roof, and not the beams, the jury could properly conclude that the failure to provide any safety equipment anytime anywhere for men

---

[20] The defendants also assert that reversible error was committed by permitting Jenkins to testify "in reverse order", and before a factual foundation had been laid upon which he could base his testimony. The substance of this objection is that Funk's "backwards" presentation facilitated the admission of irrelevant and immaterial testimony. Our conclusion that the objected-to testimony was properly admitted moots this objection.

working over 30 feet above the ground was the cause in fact of Funk's *injury.*

The judgment of the trial court is affirmed as to Darin & Armstrong with costs to Funk; and reversed as to General Motors and remanded for a new trial with costs to abide the event.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, SWAINSON, and WILLIAMS, JJ., concurred with LEVIN, J.

M. S. COLEMAN, J. *(dissent).* The majority opinion creates concepts which represent a significant departure from time tested theories of tort liability. Landowners must now disavow all but the most casual personal interest in projects undertaken on their property or assume responsibility for any on-site injuries. General contractors must now be prepared to assume responsibility for any injury received by the employee of a subcontractor, no matter how negligent the employee may be.

This alone would warrant my dissent. Additionally, the manner in which the trial was conducted denied defendants a fair hearing. I would reverse and remand for a new trial as to both defendants.

The majority opinion has not been directed to the issue of law which prompted the grant of leave to appeal. We were to describe the perimeters of the theory of intrinsically and inherently dangerous activity. The majority opinion has done nothing to untangle the snarl created by our 2-2-1-2 vote in *McDonough v General Motors Corp,* 388 Mich 430; 201 NW2d 609 (1972).

This case has been used to advance theories of employment relationships which can render the property owner and the general contractor absolute insurers for any injury received by the em-

ployee of an independent contractor. Under any circumstances, I would have reservations concerning the social value of such policy and its relationship to rules of law. Under the facts of this case, I find such theories indefensible.

Our workmen's compensation laws have insured that injured workmen will not be left uncompensated. Mr. Funk was not left uncompensated. The employer could not cite Mr. Funk's own negligence as a defense. See MCLA 411.1; MSA 17.141. The Court has afforded Mr. Funk two additional avenues of recovery and has allowed him to proceed without fear of being called to answer for his own negligence.

Like the Court of Appeals, I could easily conclude that Mr. Funk so obviously contributed to or brought about his own mishap that imposing liability on the general contractor and the property owner would be unwarranted. The facts will demonstrate this contention. The Court prefers to negate these facts. I will, however, approach this matter on issues other than contributory negligence.

The relationship of the defendants' size to the ultimate result has been like grease to the wheel. It makes it much easier to proceed from one point to another. However, the theory adopted must fall equally upon the large and the small, upon the corporation and the individual, upon the large landowner and the small homeowner.

This dissent will first detail the facts. They clearly indicate the extent of Mr. Funk's responsibility for the accident. It will then show how the defendants were prejudiced by the manner in which the trial was conducted. This alone would call for a new trial. Finally, it will explain my understanding of the Michigan precedent dealing

with the theory of inherently and intrinsically dangerous activities.

## FACTS

The true facts and issues of this case were not easily discernable because of a veritable blizzard of arguments, alleged facts, charges and counter-charges (including a claim by the defendants of inaccurate briefing and oral argument by the plaintiff). The writer has read the record, briefs and opinions, has reviewed tapes of the oral arguments and finds that the following basic facts emerge as reliable.

Plaintiff, Ellis Funk, was injured on February 27, 1967 when he fell while working in Flint, Michigan. He was employed by Ben Agree Company which had contracted with General Motors Corporation (hereafter designated GM) to supply plumbing, pipefitting and related work on an A. C. Sparkplug building. This contract had been assigned to Darin & Armstrong, the general contractor. GM employed the architect and owned the property.

On Friday, February 24, 1967, the foreman in charge of installing the sprinkler system came to Calvin Strang, the Ben Agree foreman in charge of installing pipes. He complained that 600 feet of pipe were too close to the sprinkler pipes. Mr. Strang agreed that he probably had made a mistake and said that he would have the pipe moved. Mr. Strang failed to notify his employer's representative, the project superintendent or the architect engineer of this situation.

The following Monday Mr. Strang told plaintiff and Dennis Eddington, an apprentice, to go up under the roof and move the pipe two feet to the

north. The pipe was hanging in 40-foot lengths. It was attached to the steel beams by J-hooks. Mr. Strang told the workers to use a hammer to move the hooks. Where the roof slabs had been installed, they were to push up the edge of each slab which was resting on the steel beam and move the J-hooks along. They were to work from the lower level of the structural steel under the roof.

After nearly 400 feet of pipe had been moved, the workers came to a part of the roofing which was stuck. Without informing the foreman, Funk and the apprentice went up on the roof. (The roofing subcontractor was working in another area.) With a hatchet, they chipped away ice which had collected around the roof slabs. Using a crowbar, they succeeded in moving four slabs weighing over 200 pounds each, turning them back onto the solid roof. Reaching down through the holes, they moved the J-hooks.

When they came to a ventilator shaft (or heat duct), two slabs were pulled from under the metal skirt surrounding the shaft. The workers did not move the slabs completely. They were left in a "teeter-totter" fashion on a beam which ran diagonally beneath them. Because of the position of the J-hook, Eddington was preparing to reach through the ventilator and was on his hands and knees.

What happened here is interpreted differently by plaintiff and the assistant. Plaintiff states that he was kneeling near one of the holes created by removing a slab and was using his hammer to push himself up when he slipped or the hammer slipped. He stated that he reached for the protrusion which came up a foot or so around the ventilator, missed and fell on the "teeter-totter" slab.

Mr. Eddington testified that plaintiff was standing, not kneeling, when he fell. The assistant said

that the steel came right up to the side of the ventilator. Therefore, he had intended to reach the J-hook through the ventilator and not go through the hole made by pulling back the slab. Mr. Eddington had looked up from his kneeling position to see plaintiff standing on his feet. He then heard a "holler" as he looked back down the ventilator and looked up again to see plaintiff falling feet first through the opening left by pulling back the slab.

In any event, plaintiff fell to the floor beneath and was injured.

The foreman claimed that he did not know that Mr. Funk was on the roof until after the fall. Darin & Armstrong and GM claim that they had no knowledge of the moving of the pipe and no knowledge that plaintiff was on the roof at any time.

It is noteworthy that Mr. Funk, a journeyman plumber and pipefitter of 17-years experience, (1) failed to ask for instructions from his foreman when he wished to proceed other than as directed, and (2) "crossed the line" into the work of another subcontractor. Mr. Funk affirmed that he would take orders only from his foreman. He said that if any other craft "crossed over" into his area of responsibility, he would have complained to his steward. He admitted that this was wrong and contrary to the custom of the trade.

The case was tried before a jury. The trial judge stated that to find defendants liable plaintiff had to prove by a preponderance of the evidence that defendants were guilty of negligence and that such negligence was the proximate cause of the accident. Negligence was defined as the "violation of a legally imposed duty." It was sufficient to show that either or both of the defendants acted, or

failed to act, in a manner which was reasonably prudent and careful.

GM was said to owe plaintiff a duty to hire competent contractors. No other duties were required unless the jury found that the custom and usage of the trade was such as required GM to protect such workers or that GM had retained control of the construction site.

GM was also said to be liable if the work was inherently or intrinsically dangerous. This is an exception to the general rule that the owner is not liable for the negligence of independent contractors. The court provided the following definitions:

> "Now, what do we mean by inherently? I am going to turn to the dictionary and let the record show that I am using the dictionary of the Reader's Digest Great Encyclopedic Dictionary. Inherent: Forming a permanent and essential element or quality. It means belonging to the very nature of the thing.
>
> "Intrinsically, ladies and gentlemen of the jury, according to the dictionary, belonging to or arising from the true or fundamental nature of a thing. Essential: Inherent. They are almost together. I think that it is the type or quality of the work."

The jury returned a general verdict (upon what theory we do not know) against both defendants for $150,000 on August 8, 1969. Requests for a judgment *n.o.v.* were denied as were the requests for a new trial.

The Court of Appeals granted defendants' motions for a judgment *n.o.v.* 37 Mich App 482; 194 NW2d 916 (1972). The reason for the injury was said to have been "a hazardous condition created by plaintiff and his assistant without the direction or knowledge of either defendant." The Court rejected the theory of inherently dangerous work

saying that the "record contains no factual support for this theory."

### CONDUCT OF TRIAL

One of the initial problems of this case is that a large amount of irrelevant and prejudicial material was delivered to the jury and to this Court. It was unreasonable to expect this jury to sort out the proper facts and effectively apply the law as given in the instructions. We are exceedingly careful in Michigan about what reaches the ears and eyes of the jury in criminal cases and increasingly permissive in what goes to the jury in civil cases. Because this case is in point, some effort should be made to give direction to the trial court which is at present caught between the Scylla of the plaintiff's bar and the Charybdis of the defendant's bar.

The present case was presented in reverse order. The testimony of expert and nonexpert witnesses was permitted on the assumption it would be applied to facts presented later in the case. Much irrelevant and inflamatory material was admitted (partially through counsel's own testimonial remarks and questions) and not connected with specific facts. This could have left the jury with opinions and impressions which were indelible. An aura of fundamental unfairness pervades the testimony and doubtless contributed to the finding of the Court of Appeals.

It is "black letter law" in Michigan that the conduct of a trial is controlled by exercise of the judge's discretion. This includes the order of proof and the sequence of witnesses.[1] This Court has

---

[1] *See Watson v Watson,* 53 Mich 168; 18 NW 605; 51 Am Rep 111 (1884); *Mally v Excelsior Wrapper Co,* 181 Mich 568; 148 NW 443 (1914); *Steele v Banninga,* 225 Mich 547; 196 NW 404 (1923); *Halloran's National Detective Agency v Weiden,* 238 Mich 242; 213 NW 158 (1927); *Brandt v C F Smith & Co,* 242 Mich 217; 218 NW 803 (1928); *Madalinski v Hill,* 277 Mich 219; 269 NW 147 (1936); *Anthony*

properly avoided interference in most instances. This case should be an exception.

The manner in which evidence was presented was a basis for reversal of a verdict for plaintiff in *Sima v Wright,* 268 Mich 352; 256 NW 349 (1934), and is relevant to the case at bar. This was an action for medical malpractice. The Court described the situation at p 355:

"In spite of frequent warning by the court that the practice was hazardous, plaintiff's counsel tried the case in reverse order. They presented their medical witnesses and asked hypothetical questions before plaintiff testified and were permitted to do so only on their assurance that the basic facts would be shown later. While the order of proof is largely in the discretion of the court, the practice employed in this case is not to be commended because it prevents opposing counsel from making specific objections to hypothetical questions and hinders the court in keeping the testimony to the issue."

In *Blickley v Luce's Estate,* 148 Mich 233; 111 NW 752 (1907), the Court said the order in which the proofs are introduced does not require a reversal "except where such course deprives the complaining party of a fair trial or occasions a miscarriage of justice." (p 241.) This echoes the rule that any error made in the conduct of a trial must be prejudicial in order to warrant reversal.[2]

The trial judge of the instant matter recognized the hazards inherent in plaintiff's presentation of proof after a few hypothetical questions were asked. The judge said in chambers that she "may have been wrong" in denying defense counsel's request that plaintiff proceed with the facts first

---

*v Cochrane,* 295 Mich 386; 295 NW 197 (1940); *Coburn v Goldberg,* 326 Mich 280; 40 NW2d 150 (1949).

[2] *Murchie v Standard Oil Co,* 355 Mich 550; 94 NW2d 799 (1959); *VanOordt v Metzler,* 375 Mich 526; 134 NW2d 609 (1965).

" * * * because you are * * * you are putting in a lot of hypotheticals, and you are saying assuming this and assuming that, and the evidence will show * * * it may be possible that you can never connect it up. I am not saying that you won't but there is a possibility that you may not connect it up, and then it is going to be very difficult for the jury to erase from their minds those things that are irrelevant. Not necessarily irrelevant, but never were connected up."

The judge went on again to say to plaintiff's attorney:

"I don't think you should be putting in all of those hypotheticals and assuming this and assuming that, and that the evidence will show this and the evidence will show that."

Much of plaintiff's testimony was in no way connected to the facts involved in plaintiff's accident. It remained in the record and was highly prejudicial.

### EXPERT WITNESSES

Inseparable from the discussion above is plaintiff's use of expert witnesses. To be specific, defendants repeatedly objected to the testimony of Robert M. Jenkins.

Mr. Jenkins testified that he had no knowledge of the construction in question, but referred to a number of companies of good reputation in the construction field and to a variety of safety methods used by different groups. The thrust of Mr. Jenkin's testimony concerned working conditions "on the steel". None of this testimony was relevant to the later developed facts. Plaintiff was not "on the steel", but had gone (needlessly) on his own, contrary to directions and without approval or knowledge of his foreman, to the roof where he

"crossed lines" into the craft of the roofers. He admittedly knew this was wrong and against the custom of the trade.

The expert testimony presented in this case had no probative value to the instant set of facts. Had the facts of the case been presented first, it is doubtful that the testimony would have been allowed.

From time to time, this Court has addressed itself to the use of an expert witness. A recent analysis appears in *O'Dowd v Linehan*, 385 Mich 491; 189 NW2d 333 (1971). The following comparison was made at p 508:

"The use of an expert is similar to that of a translator—the evidence which has been presented to the jury cannot be adequately comprehended, analyzed and weighed by it without the aid of the special knowledge of the expert as to the meaning and significance of the facts in evidence."

The Court listed (pp 509–510) three rules which govern the admissibility of expert testimony:

"1. There must be an expert. * * *

"2. There must be *facts in evidence* which require or are subject to examination and analysis by a competent expert. * * * (Emphasis added.)

"3. Finally, there must be knowledge in a particular area that belongs more to an expert than to the common man. This is the most difficult test of all. The application of it depends upon the relation of expert knowledge to common knowledge at a given time."

The verdict for defendant Linehan which was affirmed by the Court of Appeals was reversed and a new trial ordered by this Court because "there was nothing so exceptional in the record of this

case as to require an expert opinion on the ultimate issue for the jury." (p 513.)[3]

In the instant case, there were no "facts in evidence" to be analyzed by an expert. Further, the "common man" who heard the unadorned facts needed no expert to tell him what was common knowledge. The entire proceeding could not have been more confusing to the jury if plaintiff had set about structuring the case with that in mind.

By introducing the expert testimony first, there were no facts against which the judge could measure the need for or probative value of the expert testimony. Many hours were devoted to publications, periodicals and opinions having to do with safety or the lack of it in construction and non-construction work in the United States. Sometimes the testimony dealt with safety measures used in other states by those working "on the steel" which plaintiff was not doing at the time of the accident. He was working on the roof. Making ventilators safe was another subject, but Mr. Funk did not fall through a ventilator.

Mr. Jenkins, admittedly, did not know any Michigan contractors and specifically did not know Darin & Armstrong. He was a retired engineer who said that he had worked for the law firm of plaintiff's attorney on about five other cases.

The answers in the instant case to the *O'Dowd* questions therefore are:

1. Yes, there was an expert.

2. There were no facts in evidence which re-

---

[3] Also *see People v Zimmerman,* 385 Mich 417; 189 NW2d 259 (1971) which was an appeal from a conviction for negligent homicide. The issue concerned a trial judge's refusal to permit a non-eyewitness to give expert testimony on the question of an oncoming automobile's speed. Affirmed.

quired or were subject to examination and analysis by a competent expert.

3. There was no need for knowledge which belongs more to an expert than to the common man.

Further, unless the expert testimony is read with a practiced eye, one is inclined to be swept into an attitude adverse not only to defendants but to all those even remotely connected with construction business long before the actual facts of the case are elicited. This bias against the industry in general and defendants in particular permeated the proceedings, rendering it impossible to receive an impartial and fair hearing. Again, if the facts of the case had been presented first, it is unlikely that much, if any, of Mr. Jenkin's testimony would have been admitted.

On the issues set forth above, the verdict warrants reversal.

## INHERENTLY DANGEROUS ACTIVITY

Mr. Funk receives his benefits under the Workmen's Compensation Act through Ben Agree, his employer. The question here is whether he is to receive an additional award(s) from the general contractor, Darin & Armstrong, and from the owner, GM.

Although a "shotgun" approach has been employed in this matter, plaintiff has relied most heavily upon the doctrine of "inherently dangerous activity".

The doctrine applies not only to corporations, but is equally applicable to homeowners or any other citizens who employ others to do work for them—be it installing a TV antenna, removing trees or tree stumps or repairing plumbing, a porch, sidewalk, etc. This subject comes home to everyone.

In analyzing this historically imprecise doctrine, three questions must first be answered:

1. What is an inherently dangerous activity?

2. Who may invoke the doctrine?

3. Who is to decide whether the doctrine applies?

The first question is the most difficult. As Prosser indicates in his Handbook of the Law of Torts (4th Ed), the phrase has never been well defined. In his analysis of the case law, he states:

"[T]he principle seems to be limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific risk or set of risks to those in the vicinity, recognizable in advance as calling for definite precautions. The emphasis is upon the 'peculiar' character of the risk, and the need for special, unusual care." (p 473.)

In 41 Am Jur 2d, Independent Contractors § 41, the doctrine is labeled "an exception to the general rule of nonliability of an employer for the tort of an independent contractor". (p 805.)

"The theory upon which this liability is based is that a person who engages a contractor to do work of an inherently dangerous character remains subject to an absolute, nondelegable duty to see that it is performed with that degree of care which is appropriate to the circumstances, or in other words, to see that all reasonable precautions shall be taken during its performance, to the end that third persons may be effectually protected against injury. However, liability of the employer in such cases depends upon his antecedent knowledge of the danger inherent in the work or on a finding that the average, reasonably prudent man or corporation should, in the exercise of due diligence, have known." (pp 806–807.)

It is noted here also that the term "inherently

dangerous" is "not susceptible of accurate defini-
tion." (p 807.) Section 43 states:

"Ordinary building operations or activities, including
both construction and demolition, are generally not
considered work of an inherently or intrinsically dan-
gerous character rendering the employer-owner liable
for injuries resulting from the negligence of an indepen-
dent contractor in doing the work."

The Restatement Torts 2d also reflects the diffi-
culty one faces in defining inherently dangerous
activity. Section 416 defines work dangerous in
absence of special precautions:

"One who employs an independent contractor to do
work which the employer should recognize as likely to
create during its progress a peculiar risk of physical
harm to others unless special precautions are taken, is
subject to liability for physical harm caused to them by
the failure of the contractor to exercise reasonable care
to take such precautions, even though the employer has
provided for such precautions in the contract or other-
wise." Section 427 defines negligence as to danger in-
herent in the work:
"One who employs an independent contractor to do
work involving a special danger to others which the
employer knows or has reason to know to be inherent
in or normal to the work, or which he contemplates or
has reason to contemplate when making the contract, is
subject to liability for physical harm caused to such
others by the contractor's failure to take reasonable
precautions against such danger."

Comments to § 416 say that the rules above
"represent different forms of statement of the
same general rule" holding that employer liable if
injuries result "from dangers which he should
contemplate at the time that he enters into the
contract". Liability may attach if the risk is one

"which the employer should recognize as likely to arise in the course of the ordinary and usual method of doing the work, or the particular method which the employer knows that the contractor will adopt." Comments to § 427 speak of risks "recognizable in advance" and note that the section *"has no application where the negligence of the contractor creates a new risk not inherent in the work itself or in the ordinary or prescribed way of doing it and not reasonably to be contemplated by the employer."* (Emphasis added.)

These analyses refer to danger to others, third parties, although in Michigan employees have been included in a few cases involving the doctrine. However, Michigan case law does little to render the meaning of inherently dangerous activity clear. In *Lake Superior Iron Co v Erickson,* 39 Mich 492; 33 Am Rep 423 (1878), plaintiff was suing the mine owners for her husband's death. The husband was employed by a firm who had contracted to work the mine. He had been killed by a large rock which fell from the walls of the mine. There was evidence the rock had been considered dangerous prior to the accident. The Court said it was a "general principle of law that a responsibility lies somewhere to prevent workmen from being exposed without such protection as is reasonably required in a dangerous business." (p 500.)

The basic dispute in the case was where to place that responsibility. The Court noted that the owners planned the mine, selected the job site, determined where to sink the shafts. They reserved the right to determine when and where and how rock was to be removed. The Court said at 502–503:

"Under such circumstances it is very plain that the company being the owners of the dangerous property,

and inviting men to work on it, their responsibility for
its protection cannot be changed by the fact that the
work is done by the ton instead of by the day, or by the
fact that the men who contract with them have labor-
ers of their own. By employing men to act for them in
either way they hold out the assurance that they can
work in the mine on the ordinary conditions of safety
usually found in such places. They guarantee nothing
more than is usual among prudent owners, and they do
not insure against that which is purely accidental. But
they do tacitly represent that they have not been and
will not be reckless themselves."

There the site itself was not safe and the owners
knew of the danger. The Court affirmed a verdict
for the wife against the mine owners. However, in
the instant case there are no proofs that the site
was unsafe or that even his subcontractor-em-
ployer, much less the defendants, knew of Mr.
Funk's venture from his assigned location. Cer-
tainly, none could foresee that Mr. Funk would
engage in the extraordinary activities which led to
his injury and, therefore, guard against such dan-
ger.

Plaintiff in *Inglis v Millersburg Driving Associa·
tion,* 169 Mich 311; 136 NW 443 (1912) alleged
damages to his land caused by fire started on
defendant's land. The trial court directed a verdict
for the association saying it was not liable for the
act of the independent contractor hired to clear
the land. This Court reversed.

In so doing, the Court said the record clearly
showed that the members of the association had
indicated to plaintiff that the association was in
charge of the work. Plaintiff warned the members
of the dangers involved in setting the fires. Proper
precautions were not taken. Plaintiff was not told
of the independent contractor and was thus unable
to warn him of the danger.

The Court quoted the following as being an exception to the general rule that the principal is not responsible for the tortious acts of an independent contractor:

" 'Where the work is dangerous of itself, or as often termed, "inherently" or "intrinsically" dangerous, unless proper precautions are taken, liability cannot be evaded by employment of an independent contractor to do the work. Stated in another way, where injuries to third persons must be expected to arise, unless means are adopted by which such consequences may be prevented, the contractee is bound to see to the doing of that which is necessary to prevent the mischief. The injury need not be a necessary result of the work, but the work must be such as will probably, and not which merely may, cause injury if proper precautions are not taken.' " (pp 319–320.)

The Court said defendant had a duty "in doing work necessarily involving danger to others" to take such steps "against negligence as may be commensurate with the obvious danger." (p 321.)

*Olah v Katz,* 234 Mich 112; 207 NW 892 (1926) arose from an incident where a child fell into a hole dug by an independent contractor hired by defendant. The Court said at p 116:

"The general rule relied on by defendant that one who has contracted with a competent person to do a work within the scope of his independent employment is not answerable for the negligent acts of such contractor, or of his servants or agents, in the performance of the contract, is subject to the exception that immunity from responsibility may not be claimed when the work to be done is of such a character that it necessarily subjects third persons to unusual danger."[4]

[4] Also *see Wight v H. G. Christman Co,* 244 Mich 208; 221 NW 314 (1928); *Watkins v Gabriel Steel Co,* 260 Mich 692; 245 NW 801 (1932) *and Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509; 276 NW 535 (1937).

Invocation of the doctrine of inherently danger-
ous activity was rejected in *Utley v Taylor &
Gaskin, Inc,* 305 Mich 561; 9 NW2d 842 (1943). A
workman had received injuries when a steel beam
fell and struck him. He received workmen's com-
pensation benefits. Under the statute his employer
then sued the independent contractor to recover
the amount paid. Defendant, citing cases discussed
above, claimed in part that any negligence on its
part was imputable to plaintiff. The Court re-
sponded at pp 573–574:

"In the above-discussed cases, the exception to the
independent contractor rule was clearly invoked to
prevent the general contractor from escaping liability
to third persons injured in connection with 'inherently
dangerous' work, by the defense that such work was
being done by a subcontractor. In such cases the plain-
tiffs were not employees of the general contractor and,
therefore, the provision of the workmen's compensation
act under which the present suit is brought was not
involved or construed. Such cases are readily distin-
guishable from the case at hand, in which the statute
expressly gives plaintiff as employer the right to en-
force, for the benefit of his insurer, the claim of his
injured employee against defendant."

The Court of Appeals has discussed the doctrine.
In *Vannoy v City of Warren,* 15 Mich App 158;
166 NW2d 486 (1968), defendant appealed an
award to plaintiff for the death of her husband.
Death resulted in part from the presence of meth-
ane gas in the construction site. The Court re-
jected any distinction between injured persons
based on whether they were third parties or em-
ployees of the independent contractor. Such dis-
tinctions were said to violate "the absolute charac-
ter of the duty" imposed on defendant by the
dangerous nature of the activity. Determination of
whether an activity was inherently dangerous was

said to be a fact question for the jury. Leave to appeal was denied. 382 Mich 768 (1969).

A verdict of no cause of action was affirmed in *Huntley v Motor Wheel Corp*, 31 Mich App 385; 188 NW2d 5 (1971). Plaintiff had been injured while operating an electrical switch. The accident occurred in a plant owned by defendant. It was leased to another company which sublet the premises to plaintiff's employer. The Court wrote at pp 393-394:

> "As pointed out in *Vannoy v. City of Warren*, the inherently or intrinsically dangerous activity doctrine is closely akin to strict liability. The duty to make such provision against negligence as may be commensurate with the obvious dangers involved only arises where the employer is doing, or is causing to be done, 'work necessarily involving danger to others unless great care is used.' In order to apply this doctrine it must appear that the work itself was of such a nature that it would inevitably and unavoidably result in danger to others unless great care was used to prevent injury. The facts of this case are such that it cannot be said that plaintiff's injury was inevitable and that, therefore, the defendant should be held vicariously without proof of culpable negligence on its part. It would appear that the plaintiff was in fact injured by an instrumentality incidental to the work being performed by the independent contractor."

Also see *Mulcahy v Argo Steel Construction Co*, 4 Mich App 116; 144 NW2d 614 (1966), leave to appeal denied 378 Mich 741 (1966).

This Court has also had occasion to reexamine the doctrine of inherently dangerous activity in *McDonough v General Motors Corp*, 388 Mich 430; 201 NW2d 609 (1972). Plaintiff's husband was killed by a falling derrick boom. He was employed by a contractor involved in adding a floor to a Chevrolet assembly plant. Four Justices wrote

opinions, none of which had more than one cosigner. The decision of the Court was to reverse a directed verdict for defendant and remand for new trial. This case is pending on an application for rehearing.

How then are we to define what constitutes an inherently dangerous activity? The Michigan cases are uniform in holding that generally an employer is not liable for the torts of an independent contractor. An exception has been developed for activities or tasks which reasonably can be foreseen as dangerous to third parties, with a few cases extending the exception to employees. These activities include those dangerous despite use of all reasonable care and those dangerous unless reasonable care is exercised (Prosser, p 472). It is clear that this doctrine imposes a form of strict liability upon the owner or employer of the independent contractor. However, such liability is not absolute.

Without exhausting the possibilities, two situations obviously do not warrant imposition of liability. If defendant perceives the possibility of danger, and takes all reasonable steps to prevent injury from occurring, we should not hold him or her liable if injury unavoidably occurs. Similarly, the owner or employer of the independent contractor should not be required to foresee all possible activities which might create a dangerous situation and lead to injury, such as in the instant case.[5]

---

[5] The Restatement includes a section protecting the employer from liability in certain instances. Section 426 says:

"[A]n employer of an independent contractor, unless he is himself negligent, is not liable for physical harm caused by any negligence of the contractor if

"(a) The contractor's negligence consists solely in the improper manner in which he does the work, and

"(b) it creates a risk of such harm which is not inherent in or normal to the work, and

The second question posed at the beginning of this section was, "who may invoke the doctrine of inherently dangerous activity?" Some say liability only extends to business invitees or the general public. Others say employees are also included. This split was also seen in *McDonough.*

As the earlier discussion indicated, the doctrine of inherently or intrinsically dangerous activity is an exception to the general rule that an employer is not liable for the torts of an independent contractor. It was designed to prevent the employer from delegating his or her responsibility to eliminate or minimize foreseeable risks.

I feel that the thrust of the exception was to impose a duty on the employer in certain circumstances. It was not designed to afford a single class of injured persons an additional theory upon which to seek damages.

In Michigan, this Court has not seen fit to limit availability of the doctrine to nonemployee third parties.

The final question asks, "who is to decide whether liability is to be imposed under the doctrine of inherently dangerous activity?" Because the doctrine is an exception to the usual scope of duty imposed in such cases, it should be closely controlled.

First, the threshold question of what duty there is under the circumstances of the case is one of law for the judge. Second, the factual question of whether there was a breach of such duty, if any, is

---

"(c) the employer had no reason to contemplate the contractor's negligence when the contract was made."

Comment b urges that an employer "is not required to contemplate or anticipate" a contractor's negligence in performing work which one would expect to be done properly. This does not apply if the circumstances give the employer "warning of some special reason to take precautions, or some special risk of harm to others inherent in the work."

for the fact finder unless there are no facts upon which reasonable minds could disagree. Third, it is also for the fact finder to determine whether the breach of duty, if any, was the cause or proximate cause of the injury.

In the instant case, the threshold question of duty must be resolved in favor of the defendants. It is unreasonable to impose upon the defendants a duty to foresee that not only would the employee of an independent contractor act contrary to the custom of his trade in at least two respects,[6] but proceed to lift huge slabs weighing over 200 pounds, turn them back on the roof and then replace all but the last two moved. If Mr. Funk had not fallen through the hole left by removing one of the slabs, he caused any number of other hazards which could have taken a toll. Any required precautions against foreseeable dangers would not reasonably have included the hazard made by Mr. Funk himself.

In any event, the instruction to the jury as to the legal definition of inherently or intrinsically dangerous work was in error. The resolution of this issue is not necessary to the finding in this case and, therefore, would not normally be discussed. However, the proffered use of this doctrine has gained such popularity that it is deemed important to set some guidelines for the profession.

In the instant case the trial court quoted the Reader's Digest Great Encyclopedic Dictionary. This permitted the jury too much latitude. The definitions were those of common usage and were not sufficient as legal definitions of so complex a doctrine. We expect the courts to instruct the

---

[6] 1. Having been told by his foreman to work under the roof in a certain manner, he went onto the roof without approval or even knowledge of his foreman.

2. He "crossed over" into the roofer's area of responsibility.

juries fully as to the rules and principles of law
which are to be followed in analyzing the evidence.
If the instructions are deficient, then the fact
finder's conclusions are suspect.

It is easy to be critical of the jury instructions in
this case and similar cases, but not so easy to
propose a "boilerplate" instruction. However, fol-
lowing are some of the elements of the doctrine of
inherently or intrinsically dangerous activity:

1. It is work done by an independent contractor
involving a high degree of risk in relation to the
specific surroundings or involving some specific
peculiar risk or set of risks to those in the vicinity
which requires special, unusual care.

2. It is work which *probably* would result in
injury.

3. There is a risk or danger recognizable in
advance (foreseeable) as requiring special precau-
tions.

4. Such special precautions are not taken.

5. This breach of duty is the cause or proximate
cause of the injury.

In this case, plaintiff's claim must fail, insofar as
it is predicated on the doctrine of inherently dan-
gerous activity. I would not impose absolute liabil-
ity on defendants. There must be a limit to their
responsibility under this theory. A line must be
drawn and I would do so here.

As an exception to a general rule, the doctrine
must have some limits or the exception will be-
come the general rule. This would make property
owners, corporate and individual, general and ab-
solute insurers of all who come upon their prop-
erty.

Defendants should not be required to anticipate
the unusual manner in which plaintiff undertook
to complete his task. Defendants must not be held
liable for every on-site accident. Plaintiff left the

steel work and went to the roof. He did not seek help from those whose task it was to work with the roof slabs. Without notice to defendants, or even to his own employer, plaintiff created an unusual risk and then suffered injury by it. The danger was not inherent but was created by plaintiff. Defendants should not be held to answer for such conduct.

In summation, I would hold:

1. Defendants were denied a fair trial by plaintiff's failure to establish the basic facts prior to introducing certain expert and nonexpert testimony and by the failure to link such testimony with the pertinent facts.

2. Defendants were denied a fair trial by plaintiff's introduction of unnecessary "expert" testimony. Such testimony had no probative value and much prejudicial effect.

3. Defendants may not be held liable under a theory of inherently dangerous activity. Defendants could not foresee nor could they have been reasonably expected to foresee the manner in which the accident occurred. Defendants have breached no duty under this theory.

We cannot know whether the judgment was based upon negligence of the general contractor and/or owner, a retention of control over the premises by contract or otherwise, or upon the theory of inherently dangerous activity. Because at least the instruction as to inherently dangerous activity was inadequate, I would reverse the trial court and remand for a new trial consistent with these findings.[7]

---

[7] The practical application of the opinion of Justice LEVIN, reversing and remanding for a new trial as to GM and reinstating the verdict as against Darin & Armstrong, is to leave the latter liable for the entire $150,000. The verdict was jointly entered against the two defendants. Damages have been determined and the amount is not at issue. Mr. Funk cannot financially profit by continuing his suit

## J. W. Fitzgerald, J., did not sit in this case.

against GM (if the present state of the law remains applicable), so he may reasonably be expected to accept his full award and not expend further effort, time and money to pursue the question of liability of GM. What redemptive action, if any, Darin & Armstrong may pursue against GM remains to be determined.