Kelly, J.
(dissenting). With its opinion in this case, the majority injects further confusion into the area of negligence law. It does so by defining the danger that was present in this case as “working at heights without fall-protection equipment.”[1] This definition conflates the questions posed by the first two elements of the common-work-area doctrine: (1) whether the defendant contractor took reasonable steps within its supervisory and coordinating authority and (2) whether the danger was readily observable and avoidable.[2]
*116 The majority quotes with approval defendant’s argument that “plaintiff’s own failure to wear a fall-protection device did not create a high degree of risk to a significant number of workers . . . .”[3] This presumes, without explanation, that wearing personal fall protection was the only reasonable way to avoid the danger of falling from the mezzanine. The majority makes the injured worker’s failure to wear personal fall protection dispositive under the common-work-area doctrine. It does so even though, under our system of comparative negligence, a worker’s negligence is separate from the negligence of the general contractor.[4]
The majority’s resolution of this case may cause unexpected undesirable repercussions in future negligence cases. This is because it divides the question whether reasonable measures were taken to protect against a foreseeable risk into (1) whether a risk existed in the first place and (2) whether plaintiff failed to protect himself against it. The Court should avoid distorting the law of negligence in this fashion.
i
As a rule, general contractors are not liable for the negligence of independent subcontractors and the subcontractors’ employees.[5] In Funk v Gen Motors Corp,[6] *117 the Court set forth the common-work-area exception to this rule. The majority bases its rationale on a passage from Funk in which the Court summarized the Funk plaintiffs argument that the defendants had
exposed him to avoidable injury by allowing subcontractors to order the men to work at dangerous heights without any protection from falls in a job environment in which laborers were expected to complete their assigned tasks without regard to the absence of safety equipment guarding against injury in the event of a mishap.[7]
Using this passage, the majority concludes:
The Court in Funk was clear that the danger at issue was not the height itself, but the fact that the men were required to work “at dangerous heights without any protection from falls.” To hold that the unavoidable height itself was a danger sufficient to give rise to a duty would essentially impose on a general contractor strict liability for any injury resulting from a fall from an elevated common work area. This has never been the law. Moreover, because working at heights is generally an unavoidable condition of work, it cannot, by itself, be the avoidable danger Funk described. Hazards, including dangerous heights, are commonplace in construction worksites.[8]
The majority misreads the passage from Funk in several respects. First, the Court in Funk specifically referred to the heights as “dangerous heights.” To say that elevations that create a foreseeable injury from falling are not inherently dangerous defies common sense. If such elevations were not inherently dangerous, there would be no duty to protect the people who work there.
Second, according to Funk, while dangerous heights on construction projects may be unavoidable, injury from a fall is avoidable if reasonable measures are taken *118 to prevent it. Funk recognized that reasonable measures can be taken to prevent injuries from falls. That recognition places the common-work-area doctrine in the negligence regime rather than the strict-liability regime.[9]
The passage on which the majority relies faulted the general contractor for allowing subcontractors to send their men to elevated locations “without any protection from falls” and in “the absence of safety equipment guarding against injury in the event of a mishap.”[10] The passage essentially shows that the general contractor did not take reasonable steps to protect those who worked at elevations. The various reasonable steps identified in Funk were to make provisions for “suspending nets, scaffolding, bucket cranes, safety belts or har *119 nesses.”[11] Thus, Funk does not compel the conclusion the majority reaches that personal safety protection is the only way to guard against the risk of falling from heights. Nor does Funk redefine the danger posed by working at heights as the danger of confronting heights without personal fall protection, as the majority does.
The majority expressly redefines danger. Implicitly, however, it presumes that the general contractor took reasonable steps to protect workers on the job from danger when it opines that
a general contractor may be able to remove a particular hazard, but general contractors simply cannot remove all potential hazards from a construction workplace. If a hazard cannot be removed, the general contractor can take reasonable steps to require workers to use safety equipment and procedures, thereby largely reducing or eliminating the risk of resulting harm in many situations.[2]
This statement reveals the majority’s underlying premise that, unlike the general contractor in Funk, the general contractor here cannot be faulted, given that it required workers to use safety equipment and procedures. The majority also implies that the sole cause of plaintiffs fall was plaintiffs own negligence in not wearing protective fall gear. If the majority believes that the general contractor took reasonable measures to prevent falls from the mezzanine, it should say so. There is no need to redefine the danger in order to reach this result.
ii
Plaintiffs evidence shows that, after the iron workers erected the steel and the cement workers poured the floor, workers from the following trades needed access *120 to the mezzanine: carpenters, electricians, plumbers, painters, and a crew to install heating, ventilation, and cooling equipment. It was estimated that electricians, plumbers, and carpenters would use the mezzanine on numerous days, and that workers from several trades would work there at the same time. On the day of plaintiffs fall, more than 30 workers were on the construction site, but plaintiff and his coworker were the only ones working on the mezzanine.
Plaintiff and his coworker attempted to bring drywall to the mezzanine using a 3-foot-wide scissor lift.[13] The *121 6-foot-long safety cable blocking the opening onto the mezzanine had to be eased in order for them to bring up the drywall. With the safety cable lowered, a three-foot wide open space was left unprotected. On their first run, plaintiffs coworker stepped from the scissor lift onto the mezzanine holding one end of a sheet of drywall. Plaintiff came behind him. When plaintiff stepped onto the mezzanine, he lost his balance. The drywall that he was holding broke, and he fell through the unprotected space to the level below.
There should be no dispute that the mezzanine was dangerously high, given that as it was 12 to 17 feet above the lower level. Because it was more than 6 feet high, fall protection was required for the workers’ safety. The lower courts correctly noted that workers from several trades had to work at the mezzanine level at the same time. Hence, an issue of fact was created concerning whether the mezzanine was a common area. Various subcontractors needed to get onto the mezzanine numerous times over several days in order to work and load materials and equipment. By a rough estimate, a dozen workers, including carpenters, electricians, plumbers, painters, and at least four people to load heating, ventilation, and cooling equipment needed to get onto the mezzanine. After the wooden frame for the drywall was put in, there were only two ways to reach the mezzanine: by ladder and by scissor lift. All these workers faced the danger of falling from the mezzanine while loading materials or equipment. Accordingly, an issue of material fact arose about whether a significant number of workers employed by various subcontractors were exposed to the same risk.
There is no dispute that the safety cable did not provide sufficient protection, given that it had to be lowered to enable access to the mezzanine. One of the *122 questions that plaintiff raised is whether any other type of perimeter protection was feasible. In response to defendant’s “Safety Hazard Notification,” plaintiffs employer indicated that a wood-framed structure with a removal gate should have been used. The structure could have protected people from falling through the open space left after the cable was lowered. It is unclear whether such protection was feasible. Thus, the Court of Appeals correctly decided that a question of material fact existed about the availability of adequate perimeter protection.
Defendant argues that the only feasible safety protection was the use of a personal fall-protection device, such as a double-lanyard harness system hooking the worker to an anchorage point. It is undisputed that plaintiff was not wearing such a device. Plaintiffs supervisor expressed doubt about a lanyard, saying that, if plaintiff had worn one, he could not have stepped off the scissor lift onto the mezzanine.
Assuming that a personal fall-protection device could have been used, the question arises whether defendant took reasonable steps within its supervisory authority to require such a device. The project-manual provisions for defendant’s “On-Site Project Safety and Loss Control Program” state that each subcontractor “will supply the proper equipment, take the necessary precautions to maintain the equipment according to current regulations and specifications, and accept responsibility to ensure that the necessary safety equipment is supplied and used when required.” The manual further states: “The use of safety belts/harnesses and lanyards securely attached to an approved anchorage point when working from unprotected high places is mandatory.” Defendant’s manual makes clear that defendant required that personal fall protection be used when no *123 other protection was available. It shifted to the subcontractors the responsibility for providing all such safety equipment and ensuring its use.
In Funk, the Court observed that, from an economic and practical standpoint, placing the responsibility for work safety in common areas on the general contractor will “render it more likely that the various subcontractors . . . will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.”[14] It is doubtful that, under Funk, a general contractor can entirely absolve itself of liability by shifting to its subcontractors all responsibility for implementing workplace safety and for providing safety equipment.
Furthermore, a question of material fact exists concerning whether, under his supervisory authority, defendant’s construction supervisor should have been expected to enforce defendant’s safety policy. The construction supervisor knew that plaintiff and his coworker planned to use the scissor lift to hoist drywall onto the mezzanine. He also knew that they needed to lower the safety cable to do so. The question is whether the construction supervisor should have inquired about the safety protection that the carpenters planned to use when the safety cable was down.
Defendant argues that its supervisor had no authority to tell the workers how to do their jobs. That is not the issue. Rather, the issue is whether the construction supervisor had authority to supervise the workers’ safety and to enforce the general contractor’s safety policy.
Defendant also argues that a general contractor cannot be expected to monitor whether each worker on *124 the jobsite wears individual safety protection. Were such monitoring at issue, defendant might be correct because of the burden it would place on the general contractor. But, on the facts of this case, defendant’s construction supervisor was in direct personal contact with plaintiff and his coworker. He spoke with them personally as they prepared to ascend to the mezzanine. It might not be unreasonable to expect the supervisor to inquire after their safety under the circumstances.
More importantly, such an expectation is hardly unreasonable in light of defendant’s safety policy. Its safety-and-loss-control program makes a difference only if it is enforced. Certainly, a safety policy can be enforced by issuing a citation to a subcontractor after an injury occurs, which is what defendant did here. But it is reasonable to expect that a general contractor will enforce its own policy to prevent noncompliance and to avoid injury before it occurs.
m
I would affirm the lower courts’ judgments denying defendant’s motion for summary disposition and would remand the case to the trial court for further proceedings. This resolution of the case would not be tantamount to imposing strict liability on the general contractor. On the contrary, it acknowledges that reasonable minds can differ about the sufficiency of the steps the general contractor took in this case. Certainly, a jury could find that the general contractor took reasonable steps, but I would not make that determination as a matter of law. It is properly an issue for the trier of fact to resolve.
CAVANAGH, J., concurred with KELLY, J.

 Ante at 114.

 In Ormsby v Capital Welding, Inc, 471 Mich 45, 54; 684 NW2d 320 (2004), the Court listed the four elements of the common-work-area doctrine: (1) the general contractor failed to take reasonable steps within *116 its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of workers (4) in a common work area.

 Ante at 115.

 In Hardy v Monsanto Enviro-Chem Sys, Inc, 414 Mich 29, 39; 323 NW2d 270 (1982), the Court held that a general contractor could not avoid liability “ ‘by pointing to the concurrent negligence of the injured worker....”’ (Citation omitted.)

 Ormsby, 471 Mich at 53.

 Funk v Gen Motors Corp, 392 Mich 91; 220 NW2d 641 (1974), overruled in part on other grounds by Hardy.

7 Id. at 100.

8 Ante at 113-114 (emphasis deleted).

 In her dissent in Funk, Justice Coleman reviewed Michigan law on inherently dangerous activities and came to the following conclusion:
The Michigan cases are uniform in holding that generally an employer is not hable for the torts of an independent contractor. An exception has been developed for activities or tasks which reasonably can be foreseen as dangerous to third parties, with a few cases extending the exception to employees. These activities include those dangerous despite use of all reasonable care and those dangerous unless reasonable care is exercised .... It is clear that this doctrine imposes a form of strict liability upon the owner or employer of the independent contractor. However, such liability is not absolute. [Funk, 392 Mich at 135 (COLEMAN, J. dissenting).]
Justice Coleman correctly recognized that some dangerous activities cannot be made safe, whereas others can be if reasonable care is exercised. She incorrectly concluded, however, that either type of danger exposes a general contractor to strict liability. The majority in Funk held that working on elevations at construction sites can be made safe through reasonable precautions. In recognizing the various reasonable precautions that could be taken, the majority imposed on a general contractor a duty of reasonable care rather than an absolute duty to make safe.
In Ormsby, 471 Mich at 56, the Court noted that the common-work-area doctrine had not resulted in the imposition of strict liability on general contractors, despite Justice Coleman’s prediction.

 Funk, 392 Mich at 100 (emphasis added).

 Id. at 103.

12 Ante at 114 (emphasis added).

 A scissor lift is used to lift workers, materials, and equipment to elevations. It is attached to a moving piece of equipment and has a work platform.
[[Image here]]
In the picture submitted by plaintiff, the scissor lift appears on the floor to the left of the mezzanine.

 Funk, 392 Mich at 104.