NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0521n.06

Nos. 12-1624/12-1641

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MICHELLE RICHTER, Administratrix of the Estate of Michael D. Richter, Deceased | ) ) ) | |
| Plaintiff – Appellant Cross - Appellee, | ) ) | **FILED** *May 24, 2013* DEBORAH S. HUNT, Clerk |
| v. | ) ) | |
| AMERICAN AGGREGATES CORPORATION, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant – Appellee Cross - Appellant, | ) ) | |
| and | ) ) | |
| PROCESS MACHINERY, INCORPORATED, | ) ) | |
| Defendant. | ) | |

Before: MOORE and STRANCH, Circuit Judges; HOOD, District Judge[*]

**JANE B. STRANCH**, Circuit Judge. Michael Richter died in a mine construction accident

on April 6, 1991, while working for a subcontractor, Wheatland Machine & Welding, Inc.

("WMWI"). Richter's wife, Michelle Richter, filed a wrongful-death suit in federal court on behalf

of his estate. She brought suit against the general contractor of the project, Process Machinery, Inc.,

("PMI"), and the owner of the mine, American Aggregates Corporation ("AAC"), alleging various

Michigan state-law negligence claims. PMI entered into a consent judgment and is no longer a

defendant in the case. We now consider whether Ms. Richter may continue to pursue her claim

---

[*]The Honorable Joseph Martin Hood, United States District Judge for the Eastern District
of Kentucky, sitting by designation.

against AAC.  Despite an extraordinary delay in the prosecution of the case, and a shift in Michigan job-site tort law, we conclude that she may.

After PMI's 1996 consent judgment, Ms. Richter's action against AAC was suspended for over a decade as PMI pursued indemnification from various parties.  When Ms. Richter's counsel eventually re-initiated the proceedings, AAC moved to dismiss the suit for failure to prosecute and moved for summary judgment on the merits.  The district court denied the failure-to-prosecute motion, but ultimately granted summary judgment to AAC on the basis of an intervening decision in *Ormsby v. Capital Welding, Inc.*, 684 N.W.2d 320 (Mich. 2004).  Ms. Richter appealed, and AAC then cross-appealed the denial of its failure-to-prosecute motion.

For the reasons outlined below, we conclude that the district court did not abuse its discretion in denying AAC's failure-to-prosecute motion.  On the merits, however, a genuine dispute of material fact exists as to whether AAC may be liable for the negligence of its general contractor under Michigan's "common-work-area" doctrine.  Therefore, we **REVERSE** the district court's grant of summary judgment and **REMAND** the case for further proceedings consistent with this opinion.

## I. Facts

The district court recounted the facts of the case in a 1995 order granting in part and denying in part AAC's initial motion for summary judgment:

> Defendant AAC hired Defendant [PMI] to design and erect materials necessary to construct an advanced automated 400TPH sand and gravel plant.  The work included the assembly of a new 1200 Ft. conveyer and was to be performed at a site owned by AAC in Romeo, Michigan.  PMI entered into two subcontracts to complete the job – one with Wheatland Machine & Welding, Inc. ("WMWI") to perform the hands-on construction and assembly work, and the other with Greenville Manufacturing Works ("GMW"), a wholly owned subsidiary of AAC, to perform the

2

electrical portion of the contract. On Saturday, April 6, 1991, WMWI employees attempted to pull a long conveyer belt onto the conveyor frame, employing a rigging method. Plaintiff's decedent, Michael Richter, a WMWI employee, stood on the conveyor's elevated walkway, adjacent to the sheave block portion of the rigging system. His job was to signal the end loader operator who was pulling the cable.[1] During the conveyor belt pull, a one-quarter inch wire cord, which was attached to the "come along" used in the rigging system, snapped. This caused the sheave block to strike Michael Richter in the head, partially decapitating him and killing him instantly.

The accident was apparently caused by the one-quarter inch cord attached to the come-along, which was crimped in a number of places. However, the Greenlee hook sheave used in the rigging process, which had been loaned to WMWI by GMW, was also inappropriately used. The sheave was intended for use with electrical cable, not wire cord. Neither AAC nor GMW employees were present on the Saturday of Michael Richter's accident. There was, however, an AAC supervisor continuously on the job site Mondays through Fridays, and he was there on the preceding Friday, when the instant rigging was set up.

Nov. 22, 1995 Mem. Op. 1–2, App. 309–10.

On the Saturday of the accident, WMWI workers were scheduled to work on the second half of the belt pull for a large section of the conveyor. PMI's field representative, Wayne Ritchie, had set up to begin the belt pull on Tuesday of that week. *See* Snyder Dep. 53, R. 174-1 at PageID# 1466; Ritchie Dep., App. 418–23. Workers described the initial task as pulling the bottom half of the large belt into place on the conveyor structure. It is not entirely clear whether some pulling of the top half of the belt occurred on Friday or whether on that day only the set up of the pulley system was completed. *See* Hooper Dep. 236, at PageID# 2127; Snyder Dep. 44, 50, R. 174-1, at PageID# 1457, 1463. On Saturday, work was briefly delayed due to weather. Richter's accident then occurred as the WMWI employees worked on pulling the top half of the belt into place. After the

---

[1]A loader is a type of tractor or bulldozer commonly used on construction sites. The workers in this case had attached a cable or wire to the loader and using machine to pull the belt up onto the conveyor frame.

accident, the belt pull was suspended. Several days later, WMWI and PMI re-initiated and finished the task they had been working on that Saturday. *See* Snyder Dep. 98–100, R. 174-1 at PageID# 1511–13; *Id.* at 275–76, 295–96, R. 176-1 at PageID# 1748–49, 1768–69; Mullins Dep. 89, 132, R. 172-2 at PageID #1142, 1185; West Dep. 93–94, R. 177-1 at PageID #1908–09. Thereafter, the team proceeded with similar pulls for different belt sections of the same conveyor. *See* Ritchie Dep., App. 435–36.

According to WMWI workers, AAC—the owner—and PMI—the general contractor—both took leadership roles on the job site. Joe Enochs, the representative of AAC, was "the job site engineer." Hooper Dep. 169–70, App. 229–30.[2] Enochs reviewed the safety procedures of the subcontractors—for example, telling WMWI workers that they had to wear hardhats while on the job. *See* Ritchie Dep. 75, App. 240. Enochs would monitor tasks and ask workers to operate equipment in a different manner, *see* Hooper Dep. 169–70, App. 229–30, and was the individual on the site who would approve or not approve a subcontractor's work, *see* Ritchie Dep. 75, App. 240, 396.

Various workers observed Wayne Ritchie, the field representative for PMI, preparing the rigging for the belt pull earlier in the week. *See* AAC Office Mem., R. 179-3 at PageID #2110–11; Hooper Dep. 222–24, R. 179-4 at PageID #2120–22.[3] And, after the accident, Ritchie worked on

[2]There is some confusion in the record as to whether the AAC job-site engineer was named Joe Enochs or Joe Ennis. Here, forced to choose one or the other without further guidance, we will refer to him as Enochs.

[3]Ritchie denies setting up the rigging for the belt pull, but, for the purpose of reviewing this motion for summary judgment, we review the facts in the light most favorable to the nonmoving party. Ms. Richter provided testimony from various sources to support her contention that Ritchie "devised" the belt-pull rigging, *see* Appellant's Br. 6–7, and Ritchie testified that the method was in plain sight where he could see it if he had looked. Ritchie Dep., App. 426.

4

repairing the gas-powered winch, a device intended for belt-pulling that had been out of service and which was subsequently used to complete the remaining belt pulls. Snyder Dep. 275–76, R. 179-5 at PageID #2131–32. WMWI's owner, Rod Mullins, testified that PMI "wanted to control every move . . . . We could not start anything or finish anything without them coming and trying to tell us how to do it." Mullins Dep. 106, R. 179-15 at PageID #2324.

On the day of the accident, however, neither Enochs nor Ritchie was on the job site. In fact, the three PMI employees, four AAC employees, and seven of the GMW employees working on the project were not present.[4] Only six WMWI employees—Richter, Michael Snyder, Garrett Hooper, Chris Jackson, Healy Burkes, and Rick West—out of the thirteen WMWI employees working on the project were in or around the area of the accident when it occurred. See MSHA Report 5–6, R. 179-11 at PageID #2190–91. Mullins was also on the job site, but not in the area of the accident, at the time that it occurred. Mullins Dep. 72, R. 172-1 at PageID #1125.

When the accident happened, Snyder was operating the front-end loader that was providing the power to pull the cable through the rigging system. Richter, Hooper, and Burkes were standing on the "catwalk" elevated walkway lining the conveyor. The catwalk provided the only access to certain sections of the conveyor, and there is evidence that on other days GMW employees used the catwalk to work on the conveyor's electrical systems and that employees of PMI and AAC also used the catwalk to inspect the operation and fix problems. See Ritchie Dep., App. 378–81, 383. When the first half of the belt pull had been completed earlier in the week, the conveyor area was not

---

[4]Ritchie testified that, including himself there were three PMI employees who worked on site at the project, that there were seven GMW employees working on the project, and that four AAC employees worked on the site at times. See Ritchie Dep., App. 384–88, 395–95, 404.

blocked off in any way, nor did Ritchie give any instructions to subcontractor employees to stay out of the vicinity. *Id.* at 427.

After the accident, the federal Mine Safety and Health Administration ("MSHA") carried out an investigation and published an accident report. The report concluded that the direct cause of the accident was the failure of the come-along wire rope that had been used as part of the rigging system. Prior to the accident, the cable had been "seriously damaged" by other uses during the rigging changes, and that damage had contributed to its failure. The come-along also was inappropriately used, as it was a "hand operated tool of insufficient strength for use with a machine capable [of] breaking any and all parts of the device." MSHA Report, R. 179-11 at PageID #2199. The front-end loader used to pull through the rigging system "could produce a force sufficient to destroy any part of the rigging used." *Id.* The MSHA issued a citation, finding that the rigging "had been improperly assembled." *Id.* at 8, PageID #2193.

## II. Procedural history

Ms. Richter filed her federal complaint on April 1, 1994. She alleged that AAC was liable for negligence as the owner of the gravel-mine project and that PMI was liable for negligence as the general contractor. AAC filed an initial motion for summary judgment, relying on the rule that an owner generally is not liable for the negligence of an independent contractor. In response, Ms. Richter defended her action with reference to two established exceptions to that rule: (1) the inherently dangerous activities exception and (2) what was then referred to as the "retained control" exception.

The district court narrowed the claims at issue in a November 22, 1995 order. The court considered and rejected the application of the inherently dangerous activities exception to the facts

of the case, finding that the risk was created by improper use of equipment and was not inherent in the nature of the work. The court also determined that Ms. Richter had waived other arguments plausibly alleged in the complaint—such as claims based on a "Safe Place to Work" theory or a failure-to-warn premises-liability theory. But there was, the court found, sufficient evidence to raise a genuine dispute as to whether AAC had retained sufficient control of the construction site to invoke the then-denominated "retained control" exception to owner nonliability. AAC unsuccessfully moved for reconsideration.

The long delay began the following year. In late 1996, PMI entered a consent judgment for $1,000,000 with Ms. Richter. The district court subsequently stayed further action on Ms. Richter's "retained control" cause of action against AAC as PMI pursued an indemnification suit in Kentucky state court against WMWI and its insurers. PMI and Ms. Richter filed a notice of satisfaction of judgment with the federal district court on March 26, 2004, but PMI's ultimately unsuccessful indemnification litigation was not final until October 24, 2007. On February 14, 2008, counsel for Ms. Richter contacted counsel for AAC to advise that she planned to re-commence her suit against AAC.

Sorting out the effects of various intervening corporate transactions caused further delay. After the case was stayed, AAC was broken up and sold by its parent corporation, CSR. The bulk of AAC was sold to another corporation, Martin Marietta Materials, Inc. ("Martin Marietta"). The portion of AAC that included the Michigan operations was sold to a third corporation, Levy Indiana Slag Co. ("Levy"), and then later CSR itself was acquired by a fourth corporation, CEMEX. In addition, the general-liability insurer originally responsible for defending AAC in the Richter litigation became insolvent and was liquidated in 2003. On February 24, 2010, AAC (and Martin

7

Marietta) requested permission to file a third-party complaint in the Richter litigation, alleging that AAC should be defended and indemnified by CSR, CEMEX, and Levy pursuant to language in a stock-purchase agreement. A year and a half later, the third-party complaint was dismissed and the district court entered a stipulated order requiring the relief AAC had sought.

On October 19, 2011, AAC filed the motion that led to the summary judgment decision we now review. AAC requested that Ms. Richter's suit be dismissed for failure to prosecute under FRCP 41(b); moved for FRCP 60(b) relief from the court's 1996 judgment denying reconsideration of its initial summary-judgment motion; and requested that summary judgment now be granted on the "retained control" theory—on the basis of the intervening Michigan Supreme Court decision in *Ormsby*, 684 N.W.2d 320. Under *Ormsby*, the theory of retained control can only result in liability if the plaintiff also meets all four prongs of the "common work area" test derived from *Funk v. Gen. Motors Corp.,* 220 N.W.2d 641, 646 (Mich. 1974). AAC argued that Ms. Richter could not meet all four prongs of that test.

The district court granted summary judgment to AAC. The court declined to dismiss the suit for failure to prosecute, finding no evidence that Plaintiff had acted in bad faith or been dilatory and no evidence of prejudice to defendant. But the court granted AAC's Rule 60(b)(6) motion, awarding summary judgment to and agreeing with AAC that Ms. Richter could not meet the third and fourth prongs of the common-work-area test.

On appeal, Plaintiff presents two issues: (1) whether the district court erred in concluding that Plaintiff could not meet the common-work-area test; and (2) whether the district court erred in dismissing the case even though the Plaintiff's complaint had alleged general negligence against AAC, which could be satisfied by demonstrating AAC's vicarious liability for PMI's "active

8

negligence." AAC counters that the district court abused its discretion in denying the Rule 41 motion for failure to prosecute.

### III. Discussion

### A. Failure to prosecute

In reviewing a district court's decision on a motion to dismiss for lack of prosecution, we apply an abuse-of-discretion standard. *Schafer v. City of Defiance Police Dept.*, 529 F.3d 731, 736 (6th Cir. 2008). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or uses an erroneous legal standard." *Id.* (quoting *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir.1998)).

Fed. R. Civ. P. 41(b) provides district courts with authority to dismiss a case where "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order[.]" This court evaluates four factors to determine whether a Rule 41(b) dismissal is appropriate: "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999).

The district court identified the correct legal standard and considered each of these four factors. While the court acknowledged that AAC's motion served as notice to Ms. Richter, the court found the notice factor here was outweighed by the other three. The court found no bad faith on Ms. Richter's part, no prejudice to AAC, and no reason to consider less drastic sanctions. Thus, the court concluded, dismissal was inappropriate.

9

With regard to bad faith, the district court specifically noted that the court had given Ms. Richter leave to suspend prosecution while PMI's indemnity action was pursued, and that Ms. Richter had contacted AAC to reinitiate proceedings within a few months of the date at which that indemnity action became final. AAC argued that the district court had advised Ms. Richter to report on the status of the indemnity action and that she had failed to do so. The court, however, noted that there was no evidence in the record that Ms. Richter had been required to make such a report.

With regard to prejudice, the court interpreted AAC's theory as an argument that it had been prejudiced by the loss of evidence that occurred due to the passage of time. AAC alleged that it could not find five of the witnesses who had been deposed in the case, that a box of files could not be found, and that other files may have been destroyed. The court rejected that argument, noting that AAC was in possession of the deposition testimony of unavailable witnesses and therefore that any evidence lost was not irretrievable.

Now, contesting the district court's decision, AAC does not argue that the district court applied the wrong legal standard or that its factual findings were erroneous. Nor does AAC attempt to specify exactly what prejudice it would face from renewed prosecution. Instead, it confines the briefing on cross-appeal to the argument that the district court should have presumed prejudice solely from the extended passage of time. The case law AAC marshals in support of this argument, however, does not suggest an abuse of discretion. We have held that prejudice *may be presumed* from an unreasonable delay. *See Refior v. Lansing Drop Forge Co.*, 124 F.2d 440, 444 (6th Cir. 1942). We have not held, as AAC seems to argue, that prejudice *must be found* in every case—even where, as here, sworn deposition testimony of a missing witness exists.

10

Finally, at oral argument, AAC asserted that it was prejudiced by the 2003 liquidation of its general-liability insurer. While AAC mentioned the fact of liquidation in briefing its motion, it did not explicitly argue there that prejudice had resulted. Indeed, given the web of indemnification in this case, it is not immediately clear that AAC would be prejudiced by the liquidation or even that the insurer would have been contractually obligated to defend AAC had it not been liquidated. In any case, AAC did not argue in its appellate briefing that the district court abused its discretion by failing to find prejudice caused by the insurer's failure, and this court generally does not consider theories raised for the first time at oral argument. *See United States v. Archibald*, 589 F.3d 289, 298 n.7 (6th Cir. 2009).

The delay in this case is certainly substantial. But, as the district court noted, dismissal for failure to prosecute "is a harsh sanction which the court should order only in extreme situations showing a clear record of contumacious conduct by the plaintiff." *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005). Moreover, a district court "must be given substantial discretion" in managing its docket and determining whether a delay results in unnecessary burdens on the court and on opposing parties. *Knoll*, 176 F.3d at 363. The district court here applied the correct legal standard and justified each finding with relevant evidence from the record. We therefore find no abuse of discretion, and we affirm the denial of AAC's motion to dismiss for failure to prosecute.

## B. Summary judgment

We review a motion for summary judgment *de novo*. *Brooks v. Am. Broad. Cos.*, 932 F.2d 495, 500 (6th Cir. 1991). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

11

Because federal jurisdiction in this case is based on diversity of citizenship, federal courts apply the substantive law of the forum state of Michigan. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "In resolving issues of Michigan law, we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, --- F.3d ----, No. 12-2021, 2013 WL 1442263, at *2 (6th Cir. Apr. 10, 2013). "In making this determination, '[i]ntermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.* (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir.2008)). *Cf. Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 257 n.1 (6th Cir. 2011) (noting that decisions of the Michigan intermediate courts are binding authority under Michigan law).

Ms. Richter argues that the district court improperly granted summary judgment to AAC because there are two avenues through which AAC may be held liable under Michigan law: first, under the "common work area" exception to the general rule that an owner is not liable for the negligence of independent contractors; and second, under a theory that AAC may be liable for PMI's active negligence under traditional common-law rules of vicarious liability. AAC argues that the common-work-area claim fails on the merits; that Richter forfeited her alternative theory by failing to raise it below; and that, in any case, the alternative theory fails on the merits as well.

1. **Legal standard**

"It has been long established in Michigan that a person who hires an independent contractor is not liable for injuries that the contractor negligently causes." *DeShambo v. Nielsen*, 684 N.W.2d 332, 335 (Mich. 2004); *Bosak v. Hutchinson*, 375 N.W.2d 333, 338 (Mich. 1985) (citing 2

12

Restatement Torts, 2d, § 409, p. 370). This rule applies both to landowners who hire independent contractors and to general contractors who hire subcontractors. *Ghaffari v. Turner Constr. Co.*, 699 N.W.2d 687, 689–90 (Mich. 2005).

Michigan law, however, provides for various exceptions to the rule. An owner has a nondelegable duty to prevent harm resulting from an inherently dangerous activity. *See Bosak*, 375 N.W.2d at 338. And landlords have a nondelegable duty to exercise reasonable care in making repairs and thus may be liable to tenants for the negligence of an independent contractor who fails to properly make the requested repairs. *Misiulis v. Milbrand Maint. Corp.*, 218 N.W.2d 68, 74 (Mich. Ct. App. 1974).

In other situations, the nonliability rule does not apply because the owner—in addition to the contractor—has been *personally* at fault. "Although other courts have generally referred to such situations as Exceptions to the general rule, it would seem analytically more accurate to denominate them Exclusions from that rule, since vicarious liability is not involved and the rule is thus not called into play." *Misiulis*, 218 N.W.2d at 70. The most obvious example would be "active negligence" where an owner or general contractor takes some specific action that is the proximate cause of harm to a plaintiff. *See Johnson v. A & M Custom Built Homes of W. Bloomfield, LPC*, 683 N.W.2d 229, 231 (Mich. Ct. App. 2004) ("[N]othing in our state's jurisprudence absolves a subcontractor—or anyone on a construction job—of liability under the common-law theory of active negligence."); *Latham v. Barton Malow Co.*, 746 N.W.2d 868, 872 (Mich. 2008) (describing the common-law rule as "*in the absence of its own active negligence*, a general contractor is not liable for the negligence of a subcontractor or a subcontractor's employee" (emphasis added)).

Similarly, a landowner also may be subject to traditional premises liability to a business invitee where the owner may have knowledge of a dangerous condition, and fails to assure that it is fixed, *see Perry v. McLouth Steel Corp.*, 397 N.W.2d 284, 287 (Mich. Ct. App. 1986), or fails to warn business invitees of that condition, *see Tillman v. Great Lakes Steel Corp.*, 17 F. Supp. 2d 672, 679 (E.D. Mich. 1998) (listing cases). Where the injured party is the employee of a contractor or subcontractor, this duty to warn of hidden dangers has been called the "safe-place-to-work doctrine." *See Nemeth v. Detroit Edison Co.*, 182 N.W.2d 617, 619–20 (Mich. Ct. App. 1970).

In 1974, the Michigan Supreme Court established an additional exception to the nonliability rule, applying to injuries to the employees of independent contractors—the common-work-area exception. *Funk* 220 N.W.2d at 646. Under this exception, a general contractor or property owner can be liable for the negligence of a contractor if "(1) the defendant, either the property owner or general contractor, failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of workmen (4) in a common work area." *Ormsby*, 684 N.W.2d at 326. A property owner can be liable under the common-work-area exception only "if he does not truly delegate—if he retains 'control' of the work—or if by rule of law or statute, the duty to guard against the risk is made 'nondelegable.'" *Funk*, 220 N.W.2d at 645. Otherwise, the liability remains with the contractor.

For years, many courts—including the district court in its 1995 order in this case—interpreted *Funk* as establishing two separate exceptions, a common-work-area exception and a retained-control exception. In 2004, the Michigan Supreme Court clarified that "these two doctrines are not two distinct and separate exceptions, rather only one—the 'common work area doctrine'—is an

14

exception to the general rule of nonliability for the negligent acts of independent subcontractors and their employees." *Ormsby*, 684 N.W.2d at 323. The court further explained that "the 'retained control doctrine' is a doctrine subordinate to the 'common work area doctrine' and is not itself an exception to the general rule of nonliability." *Id.* Rather, the retained-control doctrine "simply stands for the proposition that when the *Funk* 'common work area doctrine' would apply, and the property owner has sufficiently 'retained control' over the construction project, that owner steps into the shoes of the general contractor and is held to the same degree of care as the general contractor." *Id.* In sum, *Ormsby* has clarified that an owner cannot be held liable under the *Funk* doctrine unless all four elements of the common-work-area doctrine are present *and* the owner has retained sufficient control of the workplace.

### 2. Common-work-area theory

In its 1995 order in this case, the district court denied summary judgment to AAC on a retained-control theory without considering the common-work-area factors. Thus, when prompted in 2011 by AAC, the property owner, the district court correctly decided to reconsider the 1995 order. Looking at the question anew, the district court entered judgment in favor of AAC, holding that Ms. Richter could not meet the requirements of the third and fourth elements of the common-work-area doctrine—the "significant number of workers" and the "common work area" elements.

The district court's decision appeared to turn on a question of timing. Ms. Richter argued that, over the course of normal workday, all of the workers of all four employers—as many as twenty in all—might use the same walkway on which Richter was killed. The court, however, reasoned that Ms. Richter was required to show a significant number of employees working for multiple subcontractors were exposed to the danger *at the time of the accident*. The evidence was that "only

15

three workmen, including the Decedent, were on the elevated pathway adjacent to the conveyor belt . . . at the time of the accident," and that "only WMWI employees were present on the day the accident occurred." *Richter v. Process Mach., Inc.*, No. 94-cv-71301, 2012 WL 1354057, at *7 (E.D. Mich. Apr. 18, 2012). Because in this case, the district court explained, "the risk of danger posed by the defective sheave block and rigging system only exposed a few employees of one subcontractor to danger[,] [t]he common work area exception . . . does not apply." *Id.*

Michigan law, though, does not require such a result. Rather, the majority of published decisions support Ms. Richter's position that the common-work-area determination is not confined to a snapshot in time. In *Hughes v. PMG Bldg., Inc.*, the Michigan Court of Appeals explained that "[i]t is not necessary that other subcontractors be working on the same site at the same time; the common work area rule merely requires that employees of two or more subcontractors eventually work in the area." 574 N.W.2d 691, 694 (Mich. Ct. App. 1997). The court gave further guidance, stating that the rule is "an effort to distinguish between a situation where employees of a subcontractor were working on a unique project in isolation from other workers and a situation where employees of a number of subcontractors were all subject to the same risk of harm." *Id.* at 695.

Likewise, the plurality opinion in *Groncki v. Detroit Edison Co.* reasoned that "for a common work area to exist there must be an area where the employees of two or more subcontractors will eventually work." 557 N.W.2d 289, 297 (Mich. 1996).[7] There, the plaintiff had established a

---

[7]*Groncki* did not garner a clear majority, and therefore it is not binding authority. *See Ormsby*, 684 N.W.2d at 327 n.8. Nonetheless, the language of the plurality opinion in *Groncki* is consistent with the oft-cited Court of Appeals cases in *Hughes v. PMG Building, Inc.*, 574 N.W.2d 691, 694 (Mich. Ct. App. 1997) and *Candelaria v. B C Gen. Contractors, Inc.*, 600 N.W.2d 348, 353 (Mich. Ct. App. 1999), and therefore serves as persuasive authority in our diversity analysis.

16

genuine issue of material fact by putting forth evidence demonstrating that the site of the accident "was used by all workmen on the project," while the defendant asserted that the injured worker "was the only person who worked in that area." *Id.* A later case, *Candelaria v. B C Gen. Contractors, Inc.*, echoes this conception of the doctrine, explaining that "[i]n order to have a 'common work area,' there need not be multiple subcontractors working on the same site at the same time. All that is required is that employees of two or more subcontractors eventually work in the same area." 600 N.W.2d 348, 353 (Mich. Ct. App. 1999).

*Ormsby* itself also favors Ms. Richter's position and provides guidance on the proper standard. In *Ormsby*, the court expressly adopted the language of *Hughes*—with the core requirement that a significant number of workers of a number of contractors are "subject to the same risk or hazard." *Ormsby*, 684 N.W.2d at 328 n.9 (quoting *Hughes*, 574 N.W.2d at 695); *see Smith v. BREA Prop. Mgmt.*, 490 F. App'x 682, 685 (6th Cir. 2012) (concluding that *Ormsby*'s "statement of the doctrine . . . [requires] Smith to prove that SDI employees were subject to the same risk or hazard that caused Smith's accident as employees of other subcontractors").

In *Ormsby*, the court also stated that the "high degree of risk to a significant number of workers must exist when the plaintiff is injured; not after construction has been completed." 684 N.W.2d at 329 n.12. AAC interprets this language to suggest that the number of workers and subcontractors must be measured at the exact moment that the worker is injured. But this interpretation would ignore the second half of the sentence. Read as a whole, the sentence is consistent with the rest of the *Ormbsy* opinion and with the prior opinions in *Hughes*, *Groncki*, and *Candelaria*. The comparison to "after the work is completed" suggests that the time "when the plaintiff is injured" refers to the time *period* during the ongoing construction—not to a specific

17

moment. When a construction phase is over, the nature and extent of the risk to workers presumably changes, and is no longer the "same risk."

Of course, discerning the relevant time period need not involve a binary choice—during, or after, construction. Rather, it follows from *Ormsby* and its predecessors that the relevant time is the time period during which the hazardous activity is occurring or will occur—whether it lasts one hour, one day, or for the duration of a particular construction stage. *See Smith*, 490 F. App'x at 686 (measuring the number of contractors on site "[a]t the time of the hazardous activity"). The length of the relevant time period is defined by the continued existence of the same risk of harm in the same area.

Finally, we cannot agree with AAC's assertion that the one-paragraph decision in *Alderman v. J.C. Dev. Communities, L.L.C.*, 780 N.W.2d 840, 840 (Mich. 2010), forecloses Richter's argument. In *Alderman*, the Michigan Supreme Court reversed the Court of Appeals, stating:

> The risk of injury at issue here was the risk of electrocution from a subcontractor's crane coming into contact with power lines above the construction site. The only employees exposed to the risk of electrocution were two to six employees of one subcontractor, including the plaintiff, and therefore there was not a high degree of risk to a significant number of workers.

780 N.W.2d at 840 (Mich. 2010) (citing *Ormsby*, 684 N.W.2d 320). In reversing the lower court's decision, the Michigan Supreme Court rejected the lower court's determination that the risk extended to other sections of the work site—a large construction site divided into lots where each subcontractor worked—simply because the power lines were near all thirteen lots. *Id.*; *Alderman v. J C Dev. Communities., LLC*, No. 285744, 2009 WL 2607084, at *2 (Mich. Ct. App. Aug. 25, 2009). The Michigan Supreme Court's terse opinion contains no further explanation for its holding, but the most obvious one is that there was no common work area where a significant number of

18

employees were at risk. Given this reasonable factual basis for reversal, it would be wrong to instead choose to read into that brief paragraph a significant shift in the law on the timing issue. *Hughes, Groncki,* and *Candelaria* articulate a same-risk rule that is not limited to the moment of the accident, and the careful analysis in *Ormsby* appears to ratify that approach. Had the Michigan Supreme Court's intent in *Alderman* been to reverse decades of precedent, it is only reasonable to expect it to have said so explicitly and provided its rationale.

In sum, we consider *Hughes*, *Groncki*, *Candelaria* and *Ormsby* to represent the current state of the common-work-area doctrine. Under their more flexible temporal rule, a court must determine the risk at issue, how long the risk was or would be present, and whether a significant number of employees of multiple subcontractors were or would be exposed to that risk during its existence.

Applied to Ms. Richter's case, this rule suggests that it was proper to deny AAC's motion for summary judgment. Ms. Richter presented evidence that the risk from the defective rigging could include the swinging sheave block that hit Richter and also the slingshot effect on the rest of the rigging.[8] And the time period that the defective rigging and system resulted in these risks appears to have been longer than the single day on Saturday. The pull for the bottom half of the belt was performed on Wednesday and Thursday, and the rigging system for Saturday's pull was set up—and possibly "tried"—on Friday. The employees of other contractors were present during the work week, and the conveyor was not cordoned off or otherwise inaccessible to those workers. At least one GMW worker, Dan Hardy, was present because he had loaned equipment apparently used in the

---

[8]WMWI supervisor Rick West testified that on another construction site, a similar set up in which a vehicle was being used to pull a belt had resulted in a cable break, noting that "the cable broke and went zinging right by with [sic] three of us." West Dep. 113–14, R. 177-1 at PageID #1928–29.

rigging to Ritchie. Ritchie himself was also present. This demonstrates that multiple contractors worked in the relevant area, the fourth element of the common-work-area doctrine, and that the belt pull may not have been "a situation where employees of a subcontractor were working in isolation from other workers." *Ormsby*, 684 N.W.2d at 328 n.9 (quoting *Hughes*, 574 N.W.2d at 695).

Furthermore, because the common-work-area doctrine requires "that employees of two or more subcontractors *eventually* work in the same area," *Candelaria*, 600 N.W.2d at 353, we also must consider the risk that would have been present during all of the pulls necessary to complete the conveyor belt had the accident not occurred. In this case, the record is unclear as to whether the pull begun on Saturday morning was to be finished that day. But belt pulls for contiguous sections of the conveyor were performed shortly thereafter. Thus, had the accident not occurred, the apparently improper rigging system may have been used on subsequent days in the common-work-area. Ms. Richter has argued that as many as twenty workers—from four different employers—might use the catwalk where the accident happened on a normal business day, a number of employees that we assume would satisfy the "significant number" of workers element. And she points to the deposition testimony of Ritchie, stating that GMW, PMI, and Wheatland employees had to walk, stand, or utilize the conveyor belt line during the course of the project. App. at 379–83. Thus, to the extent that the belt pull had begun the prior week and could have continued into the next work week, there is a genuine dispute of fact as to whether a significant number of employees of multiple contractors would have been subject to the same risk. Under the correct legal standard, this evidence is sufficient to establish a genuine issue of material fact as to whether the conveyor-belt line was a common work area.

### 3. Vicarious liability

Ms. Richter argues that AAC may also be held vicariously liable for PMI's "active negligence" based on the evidence that Ritchie played a role in devising the defective rigging procedure. The argument, as best as we can pin it down, appears to conflate the retained-control aspect of the common-work area doctrine with the doctrine of *respondeat superior*. *See Candelaria*, 600 N.W.2d at 352–53 (describing the retained-control doctrine under *Funk* as "distinct" from the doctrine of *respondeat superior*). Ms. Richter did not fully brief this argument below. She raised it in a footnote in her summary-judgment response brief, and the district court did not address it. Given that we are remanding this case based on the common-work-area theory, we leave it to the district court to determine whether Ms. Richter has forfeited or waived this argument, and if not, whether it is viable.

### IV. Conclusion

Having determined that Michigan law does not limit the evidence for a common-work-area claim to the moment of an accident, and for the reasons articulated above, we conclude that summary judgment to AAC is not appropriate at this time. We therefore **REVERSE** the district court's grant of summary judgment to AAC, and **REMAND** this case for further proceedings consistent with this opinion.