# STATE OF MICHIGAN

# COURT OF APPEALS

RONNIE DANCER and ANNETTE DANCER,

       Plaintiffs-Appellants,

v

CLARK CONSTRUCTION COMPANY, INC.,
and BETTER BUILT CONSTRUCTION
SERVICES, INC.,

       Defendants-Appellees.

UNPUBLISHED
April 26, 2016

No. 324314
Kalamazoo Circuit Court
LC No. 2012-000571-NO

Before: MURPHY, P.J., and WILDER and BORRELLO, JJ.

PER CURIAM.

Plaintiffs, a mason tender who was injured at a construction site and his wife, appeal as of right the trial court's order granting summary disposition in favor of defendants, the general contractors in charge of the construction project, under MCR 2.116(C)(10) (no genuine issue of material fact). We reverse and remand for further proceedings.

## I. FACTS

The order appealed set forth the underlying facts that are not in dispute (parentheticals omitted):

On August 9, 2010, [plaintiff[1]] was injured when he fell approximately 35 to 40 feet from a scaffold . . . . [Plaintiff] was a union mason tender working for Leidal & Hart Mason Contractors, Inc. Leidal & Hart was selected by Better Built Construction Services, Inc.[,] to construct the masonry walls for a new building that was being built at the Fort Custer Training Center. Better Built served as a

---

[1] Because plaintiff Ronnie Dancer is the person who was injured, and plaintiff Annette Dancer's interest in this case is derivative in nature, references in this opinion to the singular "plaintiff" will pertain exclusively to Ronnie Dancer.

-1-

general contractor. The U.S. Army Corps of Engineers supervised the project and Better Built teamed with Clark Construction Company, Inc.[,] as part of a federal mentorship program. Plaintiff[s] . . . filed a Complaint alleging Defendants were negligent in supervising site safety.

Plaintiff testified in his deposition that the accident left him without memory of the particulars of his fall, but in their brief on appeal plaintiffs describe, and cite exhibits illustrating, three "mast climbing work platforms," or scaffolds, positioned eight to ten feet from each other, with those gaps in work surfaces traversed by overlapped but unsecured planks, suggesting that this was a makeshift arrangement where more sophisticated and safer equipment could have been used. This account comports with the description provided in the deposition of an apprentice electrician who worked on the project as the employee of a different subcontractor. The apprentice electrician testified that there were three scaffolding units, with the space between them connected "by 2x12s," and that workers stood on those planks with nothing under them to bridge those gaps. The apprentice electrician added that the arrangement of overlapping planks was never secured up to the time plaintiff fell. Plaintiffs further assert, and cite deposition testimony showing, that standards intended to protect workers from falls were not enforced at the time in question.

In asserting claims of negligence against defendants, plaintiffs invoked the common-work-area doctrine. In ruling on defendants' motions for summary disposition, the trial court cited authorities to establish that plaintiffs' theory of recovery required operation of the doctrine, with the court concluding that plaintiffs failed to offer evidence sufficient to create a genuine issue of material fact concerning satisfaction of two of the elements required for its invocation.

## II.  STANDARD OF REVIEW AND SUMMARY DISPOSITION PRINCIPLES

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). We likewise review de novo, as a question of law, the applicability of a legal doctrine. *James v Alberts*, 464 Mich 12, 14; 626 NW2d 158 (2001). In *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court recited the principles governing an analysis under MCR 2.116(C)(10), observing:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition

under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

### III.   THE COMMON-WORK-AREA DOCTRINE

General contractors are not normally liable for the negligence of their independent subcontractors or their employees. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 53; 684 NW2d 320 (2004). However, our Supreme Court has recognized a limited exception in connection with construction projects:

> "We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen." [*Id.* at 53-54 (citation omitted).]

Practical considerations underlying the common-work-area doctrine include that " 'even if subcontractors and supervisory employees are aware of safety violations they often are unable to rectify the situation themselves and are in too poor an economic position to compel their superiors to do so.' " *Ghaffari v Turner Constr Co*, 473 Mich 16, 21; 699 NW2d 687 (2005) (citation omitted).

A plaintiff invoking the common-work-area doctrine against a general contractor "must show that (1) the defendant . . . failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of workmen (4) in a common work area." *Ormsby*, 471 Mich at 54.

In this case, the trial court held that plaintiff "presented evidence that could create a genuine issue of material fact regarding whether there was an existence of a readily observable, avoidable danger," thus expressly concluding that plaintiffs satisfied their evidentiary burden with respect to the second element, and impliedly concluding that this applied also to the first element at least with respect to the second. But the trial court further held that "there was not a high degree of risk to a significant number of workers and there was not an existence of a common work area," thus concluding that plaintiffs failed to provide evidentiary support for the third and fourth elements.

### A.  COMMON WORK AREA

A common work area exists where "the employees of two or more subcontractors eventually work in the same area." *Candelaria v B C Gen Contractors, Inc*, 236 Mich App 67, 75; 600 NW2d 348 (1999). "[T]here need not be multiple subcontractors working on the same site at the same time." *Id.*

In this case, the trial court recognized that the evidence indicated that "subcontractors other than Leidal & Heart [sic] did use [the] scaffold at times," but ruled that the required

-3-

commonality did not exist because when plaintiff fell the scaffold was at a height of 35 to 40 feet, that only Leidal & Hart's employees used the scaffold at heights greater than 20 feet, and that "[t]he scaffold ceased to be a common work area when it reached a height above 20 feet."[2]

In championing the court's reasoning, defendants rely on a federal case, applying Michigan law, for the reasonable proposition that a work area can cease to be a common one through the course of the construction project:

> [I]t is not true that a location always remains a common work area. Even if there is an obvious danger in a particular location, there becomes a point at which there is no longer a "high degree of risk to a significant number of workers," because the workers have ceased working in the common work area. [*Sprague v Toll Bros*, 265 F Supp 2d 792, 800 (ED Mich, 2003).]

Plaintiffs protest that the trial court failed to recognize that the hazard existing at elevations above 20 feet also existed at some lower elevations. We agree that the trial court erred in concerning itself with whether the evidence indicated that any subcontractor other than Leidal & Hart operated at the elevation at which plaintiff fell, rather than whether the evidence indicated that multiple subcontractors operated at dangerous, even if lesser, elevations.

One such lesser but still-dangerous elevation is the 20 or 25 feet at which the apprentice electrician testified he had operated. Further, the foreman for a plumbing subcontractor testified in his deposition that he had used the scaffolding in question several times, possibly up to heights of 14 feet. Although a fall of 35 or 40 feet obviously poses a greater risk than one involving those lesser elevations, we think it obvious that an elevation of 14, let alone 25, feet is high enough to contribute substantially to the degree of risk that a falling hazard presents.[3]

For these reasons, we conclude that the trial court erred in concluding that the scaffold was not a common work area when plaintiff fell solely because plaintiff fell from an elevation that only he and his fellow Leidal & Hart employees reached.

---

[2] In fact, the above-referenced apprentice electrician testified that his work on the scaffolding sometimes took him to heights of 20 or 25 feet. Although that evidence is at variance with the trial court's conclusion that only plaintiff and other employees of Leidal & Hart went higher than 20 feet, it leaves intact the court's observation that the evidence indicated that only plaintiff and his colleagues approached the height from which plaintiff fell.

[3] The evidence in this case includes excerpts from a manual of safety and health requirements issued by the Army Corps of Engineers, which sets forth a "fall protection threshold height requirement" of six feet unless a different specification applies. Were it necessary to determine the precise height at which the elevation would be deemed a factor substantially increasing the risk of serious injury in the event of a fall, taking guidance from that manual would recommend six feet.

B.  HIGH DEGREE OF RISK TO A SIGNIFICANT NUMBER OF WORKERS

In concluding that the evidence did not support the proposition that the allegedly hazardous condition placed a significant number of workers at risk, the trial court stated as follows:

> Plaintiff was the only one on the scaffold. The only other worker in the area was on a crane. Thus, no other workers were in danger at the time of Plaintiff's injury. Plaintiff created the dangerous condition when he chose not to wear his fall protection device and when he improperly overlapped the planks. Therefore, Plaintiff has not established a genuine issue of material fact to show that a significant number of workers were exposed to the risk.

The court thus rejected both facets of this element, having concluded that plaintiff, not defendants, were responsible for the condition leading to plaintiff's fall because of plaintiff's role in creating a work surface of unsecured and unsupported planks and then traversing that surface without availing himself of a fall-protection device, and that the poorly positioned planks posed a danger in connection with too few workers to be actionable under the common-work-area doctrine.

1.  SIGNIFICANT NUMBER OF WORKERS

There was in fact conflicting evidence concerning whether plaintiff was alone on the scaffold when he fell.  An equipment operator for Leidal & Hart testified on deposition that, although "probably at least eight" of that company's employees were working on the scaffolding on the day of plaintiff's accident, they were instructed to leave the site because of progressively heavy rain, leaving no one in the work area but plaintiff until after he fell.  In contrast, the above-mentioned apprentice electrician testified that he was "pretty sure" that at the time plaintiff fell "there was [sic] other laborers up there."  The trial court thus erred in stating, as if established fact, that plaintiff was alone on the scaffold when he fell.  Of greater significance, however, is that the court apparently confined its consideration of how many persons were exposed to the dangerous condition at issue to persons working alongside plaintiff at the moment he fell.

The trial court quoted *Ormsby*'s statement that "[t]he high degree of risk to a significant number of workers must exist when the plaintiff is injured; not after construction has been completed," 471 Mich at 60 n 12, from which the court apparently concluded that only persons at risk at the moment of the accident bear on the question.  But the common-work-area doctrine calls for a broader inquiry.  The doctrine reflects "an effort to distinguish between a situation where employees of a subcontractor were working on a unique project in isolation from other workers and a situation where employees of a number of subcontractors were all subject to the same risk or hazard."  *Hughes v PMG Bldg, Inc*, 227 Mich App 1, 8; 574 NW2d 691 (1997).  Accordingly, workers placed at risk for purposes of the common-work-area doctrine are all workers exposed to the risk in the course of the construction project.  *Ormsby*'s admonishment not to consider conditions of the site "after construction has been completed" indicates not that the Court was differentiating the moment of the accident from all other times, but rather that it was distinguishing the risks present when the accident occurred as part of the ongoing

construction project from conditions in place as of the completion of the project. In other words, the Court was calling for differentiation between the characteristics of the construction site from those of the finished project.

The United States Court of Appeals for the Sixth Circuit, applying *Ormsby*, *Hughes*, *Candelaria*, and other Michigan caselaw, persuasively[4] held that "the common-work-area determination is not confined to a snapshot in time," that " 'when the plaintiff is injured' refers to the time period during the ongoing construction—not to a specific moment," and thus that "[t]he length of the relevant time period is defined by the continued existence of the same risk of harm in the same area." *Richter v American Aggregates Corp*, 522 Fed Appx 253, 263 (CA 6, 2013). Accordingly, whether plaintiff happened to be alone on the scaffolding when he fell has little bearing. At issue is whether the evidence of all workers operating on the allegedly defective scaffolding during the ongoing construction project added up to a significant number.

As noted, there was evidence to show that several masons were on the scaffolding earlier in the day of plaintiff's fall. Beyond that, the apprentice electrician testified that, before plaintiff's fall, the electrician had "stepped on the edge of a board and another individual was on the other end and he ended upraising up and [they] both kind of danced back and forth till [they] both landed on something solid," and that this had happened while they were about 10 feet off the ground. This testimony placed into evidence that one and possibly two workers not under Leidal & Hart's auspices were placed at risk by the hazard at issue. The apprentice electrician additionally testified that caulking contractors used the scaffolding; although he was unsure if the caulkers were a subset of the masons, he nonetheless put into evidence that still other workers were exposed to the hazard.

Further, a worker whose duties for the project included helping Better Built learn how to tend to such large projects stated in his deposition that workers who "could have been" upon the scaffolding at some time included "the iron workers," "maybe the electricians," and the "mechanical guys" whose work involved heating and air conditioning. Additionally, the afore-mentioned foreman for the plumbing subcontractor testified that he had used the scaffold at heights up to 14 feet, and added that he frequently observed the electricians using it as well.

The trial court observed that the caselaw does not specify a minimum number of workers required to satisfy the "substantial number" requirement of the common-work-area doctrine, but that *Hughes*, 227 Mich App at 8, advises that four is insufficient. We take further guidance from *Latham v Barton Malow Co*, 480 Mich 105; 746 NW2d 868 (2008). In *Latham*, our Supreme Court remanded a case involving the common-work-area doctrine for, among other things, redetermination of the question whether the hazardous condition at issue put at risk a significant number of workers. *Id.* at 115 n 25. The Court did not discourse on what number would be required, but presumably would not have deemed the question open if it thought that the "rough estimate" of a dozen such workers the dissent identified, *id.* at 121 (KELLY, J., joined by

---

[4] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

CAVANAGH, J., dissenting), was not sufficient as a matter of law. In this case, plaintiffs plausibly assert that the evidence supports the conclusion that at least 15 workers were put at risk. We agree that the evidence that workers using the scaffold included several masons, multiplicities of electricians, iron workers, and heating and cooling workers, along with one employee of the plumbing subcontractor, established a question of material fact whether a significant number of workers occupied the allegedly unsafe scaffolding.

## 2. HIGH DEGREE OF RISK

Again, the trial court discounted the existence of an issue over the existence of a high degree of risk of avoidable danger attributable to defendants on the grounds that plaintiff failed to engage a fall-protection device, and was himself responsible for the shoddy arrangement of planks that rendered the surface from which he fell unsafe.

### a. FALL PROTECTION

In arguing that the trial court failed to recognize a material question of fact concerning fall protection, plaintiffs assert that the evidence shows that fall protection was not required of workers on raised platforms that had closed guardrails, that to the extent that the manual of the Army Corp of Engineers setting forth safety requirements required additional fall protection defendants failed to enforce the requirement, and thus that "[w]hether it was necessary for [plaintiff] to wear fall protection at the time of his fall, or whether his failure to wear fall protection was his own fault or was attributable to Defendants' negligence, are unquestionably jury questions." These arguments have merit.

A crane operator who was the only eyewitness to plaintiff's fall testified that "there were guardrails on the foot plank," and that one of plaintiff's tasks was to "make sure the safety rails were in place." A bricklaying foreman testified that workers were required to wear fall protection only where there was a fall hazard, including when a lack of protective railing left an unprotected opening, and that he had no reason to think that there was any opening in the platform from which plaintiff fell until plaintiff dislodged a plank with his weight. Plaintiff, when asked during his deposition about use of a safety harness for fall protection, stated that the harness was required only when it was necessary to open a door to the platform.

An investigator for the Michigan Occupational Safety and Health Administration testified that plaintiff was not required to wear fall protection while standing upon properly placed planks, but that "in the process of replacing them is when the fall protection would be required to be provided and used."[5]

---

[5] This Court, quoting MCL 408.1002(2), held that violation of a MIOSHA regulation could be used as evidence of negligence, but only that. *Ghaffari v Turner Constr Co*, 259 Mich App 608, 613; 676 NW2d 259 (2003), rev'd on other grounds 473 Mich 16 (2005).

Plaintiffs support their assertion that a cavalier attitude about fall protection prevailed at the construction project by pointing to deposition testimony variously describing workers' gaining access to the elevated platform of the scaffolding by climbing ladders built into the system, and working from the elevated platform, without safety lanyards with a tie-off or other fall protection.

The safety director for Leidal & Hart at the time of the project at issue, when asked at deposition about fall protection requirements, replied, "I know the OSHA rule for masons is ten feet. It's a company rule, six feet," and opined that plaintiff should have been wearing fall protection when he fell, because it was required "[i]f they're above six feet and have no guardrail or altering plank on foot plank." The safety director agreed, however, that "once the plank is replaced and there is no opening in the platform, the worker, including [plaintiff], would not be required to wear fall protection." Then, when asked if there was an opening in the planking when plaintiff fell, the safety director replied, "I can't answer that. I wasn't there."

For these reasons, we conclude that the testimony concerning whether the guardrails in place at the time of plaintiff's fall provided sufficient fall protection to satisfy the applicable safety standards, and whether plaintiff's activities at the moment called for engaging additional fall protection, presents issues of duty, breach, and comparative negligence for resolution at trial.

### b. RESPONSIBILITY FOR FAULTY PLANKING

Plaintiffs argue that a factual question exists concerning whether plaintiff in fact moved any of the planks from which he fell just before the accident.

The aforementioned bricklaying foreman testified that, on the day of the accident, after sending the bricklayers home he directed plaintiff to "raise the Hydro-Mobile and get it ready for the next day," adding that sometimes a height adjustment required moving the planks. The foreman answered in the affirmative when asked if he discussed the matter with plaintiff "before he went back up there to move the planking."

The crane operator who observed plaintiff's fall, while examining some photographs, stated that "[plaintiff] had slid these two plank[s] over, then started to walk this way. And I guess maybe he assumed that the plank[s] underneath were lapped and he couldn't see that and that's why he went through to the plank[s]." The witness elaborated, "these two plank[s] that he moved were no longer overlapped here, but the plank[s] underneath were sticking out and . . . that's basically why he went down. Because the plank[s] underneath were not on the outrigger here and then he couldn't see that because the plank[s] he slid back were on top of that gap," and that at the time of the fall "visually all the plank[s] were in place from the ground from what I could see."

Plaintiff testified that he never raised, or otherwise moved, the scaffold on this or any other job, explaining, "I would just give 'em brick and block and mud, that's all I had to do on this job." Asked of his involvement with the scaffolding in the 30 days before his accident, plaintiff stated the he walked on it, but had nothing to do with erecting that structure.

Plaintiffs characterize the latter testimony as indicating that plaintiff's responsibilities did not include raising the work platforms, and suggest that this throws into doubt the accounts of his

having moved any of the planks. But, although the evidence indicates that the planks often had to be adjusted as the scaffolding was raised or lowered, that does not mean that a person moving planks for that purpose was necessarily otherwise involved in adjusting the height of the work surface. The evidence thus appears unrebutted that plaintiff moved some of the planks constituting the work surface just before he fell.

However, that does not necessarily mean that plaintiff's own manipulation of the planks created a hazard unique to the time of his fall. The deposition testimony of the single eyewitness does not clearly indicate if plaintiff's activities involving the planks turned a safe work surface into a dangerous one, if they merely restored an inherently dangerous structure to its original form, or if they aggravated to some degree the dangers inherent in the structure.

Both defendants argue that the lack of similar spills in the hours before plaintiff's fall itself indicates that the scaffolding offered a safe work surface until plaintiff started modifying it just ahead of his fall. We decline the invitation to adopt the presumption that a safety hazard comes into existence only upon claiming its first victim.

Further, as noted, the apprentice electrician testified that, before the fall at issue, he and a coworker had avoided becoming victims of a fall themselves only because they successfully "danced" their respective ways to "something solid." This evidence of an earlier near-occurrence of a similar fall belies the suggestion that plaintiff himself created a uniquely dangerous condition, and suggests that the work surface in question, with its reliance on unsecured planks to bridge gaps, where frequent adjustment of the planks was necessary as the surface was raised or lowered, was dangerously unstable by its nature.

For these reasons, we conclude that the evidence relating to plaintiff's own role in rendering dangerous the surface from which he fell presents questions of duty, breach, and comparative negligence for resolution at trial.[6]

## IV. CONCLUSION

The trial court erroneously failed to recognize questions of material fact concerning whether the scaffolding from which plaintiff fell was a common work area, whether the conditions that caused plaintiff to fall posed a high degree of risk to a significant number of workers, and whether plaintiff's actions during the incident absolved defendants of liability. We

---

[6] Both defendants argue, as an alternative basis for affirmance, that, contrary to the trial court's conclusion, the evidence did not show the existence of a readily observable danger. In so arguing, defendants rely on their theory that plaintiff's own rearranging of the planks just ahead of his fall created the actual hazard causing the fall. We gather that the trial court properly viewed the bridging of the gaps between the scaffolding units with unsecured planks as itself potentially constituting an actionable hazard, on the ground that such allegedly unstable structure might continuously present heightened risks of accidents of the sort that took place.

therefore reverse the order granting summary disposition to defendants and remand this case to the trial court for further proceedings consistent with this opinion.

Reversed and remanded. We do not retain jurisdiction. Having fully prevailed on appeal, plaintiffs are awarded taxable costs under MCR 7.219.


/s/ William B. Murphy
/s/ Stephen L. Borrello